# Exhibit 14

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE

| | |
|---|---|
| JAMES T. WALKER,<br>　　　Complainant,<br><br>　v.<br><br>U.S. ENVIRONMENTAL PROTECTION<br>AGENCY,<br>　　　Agency. | EEOC Case No. 100-A1-7285X<br>Agency Case No. 98-0092-HQ; 99-0025-HQ;<br>99-0031-HQ<br><br>March 27, 2001 |

## DECLARATION OF CHARLES H. RIS

　　　I, Charles H. Ris, make the following statement, with knowledge that any material false representation on my part, would subject me to a charge of perjury.

　　　I am the Deputy Director of the National Center for Environmental Assessment-Washington Office (NCEA-W) in the Office of Research and Development (ORD), and I was serving in that capacity on Thursday August 27, 1998 when Complainant and Kathleen Reed had a heated verbal altercation that led to their both being asked to leave work until the following Monday. I did not observe the altercation or its immediate aftermath and what knowledge I subsequently acquired of those matters came primarily from a discussion I had that day with Arthur Payne, Acting Deputy Director for Management, NCEA, ORD, and Tonya Hamlett, a labor relations specialist from the EPA Labor and Employee Relations (LERS)staff.

　　　Upon arriving in the building following the incident, Arthur Payne and Tonya Hamlett, were interviewing Ms Reed. At the conclusion of the interview, I am told that Mr Payne asked Ms. Reed to leave the building for the balance of the day, and presumably the next day, the purpose being to temporarily distance her from any future confrontation in the work place until we could decide what to do by the following Monday. Ms. Reed was not an EPA employee, rather, she was a on-site cooperator (i.e., an intern) from the Environmental Careers Organization (ECO), and, as such, she was not directly subject to EPA leave provisions. However, since we signed an ECO time sheet for her, we felt that we would be in a position to keep her in pay status.

　　　The Complainant was then interviewed, following which, I as the second line supervisor for the Complainant, directed him to leave the office for the balance of the day on administrative leave. Shortly thereafter I followed up and instructed him to not return until Monday, August 31ˢᵗ. Insofar as these instructions were not intended to be punitive, I advised the Complainant that he would be on paid administrative leave. Again, the purpose, in accordance with advice from the labor relations specialist, was to separate the parties and allow a cooling off period. At

ATTACHMENT 4

the time I made my decision about placing the Complainant on administrative leave, neither I nor anyone else had reached any conclusions as to what exactly had happened or who was to blame. What was apparent was that we had two agitated and emotional employees who needed to be separated from each other, in order to prevent a further escalation of the incident.

The Complainant did not disguise his contempt for Ms. Reed's allegations, which he regarded as baseless. The Complainant was also very agitated over defamatory remarks that he alleged Ms. Reed made to him during their verbal altercation, which it is my understanding Ms. Reed did not deny uttering. He was particularly upset that Ms. Reed had publicly maligned him, since the altercation had occurred in cubicled space and apparently at a sufficient volume to have been overheard by nearby co-workers. He was surprised, and then exercised, over my order for him to leave the building on administrative leave.

On Monday, August 31, I instructed both Complainant and Ms. Reed in writing to have no more interactions with each other for any reason except to perhaps offer a non challenging greeting should they happen to encounter one another. I also indicated that NCEA-W responsibilities for the monitoring Ms. Reed's internship would be turned over to another staff person. Furthermore, I advised both parties that, if a future episode occurred, the offending party would be formally disciplined in a manner appropriate to their status with EPA. Finally, I noted to both Complainant and Ms. Reed that whatever had happened was unfortunate, but that it was in everyone's best interest to put the matter behind us. In that regard, NCEA-W offered to facilitate any type of reconciliation or mutual apology, if they were so inclined.

In the days and weeks to come Complainant urged me and his first line supervisor to investigate whether Ms. Reed had defamed him, to encourage the EPA Labor and Employee Relations Staff (LERS) to conduct an investigation, and for someone to investigate his allegations against Ms Reed. The LERS staff did invite other employees to step forward and provide their account of what happened, but no one offered such information. Because I and other NCEA-W management felt that the LERS inquiry was the best way to find more facts, we were unwilling to conduct a parallel investigation. We ultimately, referred the Complainant's allegations against Ms Reed to the EPA office responsible for Cooperative Agreements since NCEA's link to Ms Reed was through a cooperative agreement.

It soon became apparent to me that unraveling the truth of what transpired between Complainant and Ms. Reed would be difficult, insofar as there were no witnesses who saw the episode and no one who would admit to overhearing it. The facts surrounding the altercation were a "he said/she said" matter, with no way of verifying whose account was accurate. Thus, early on, I and other managers realized that there would be no substantiation of Ms. Reed's account and no basis for taking an adverse action against the Complainant. As I saw it, Ms. Reed's imminent completion of her internship and departure from the Agency should put an end to the entire affair.

Unfortunately, the Complainant could not let the Reed incident go, and he did nothing to disguise his animosity toward Ms. Reed. I and others in the management chain thought that such a posture was ill-advised, and I tried to persuade the Complainant that since, from our view

nothing adverse to him had resulted from the Reed episode, he should simply put it behind him. I was also concerned that his persistent focus on the matter could distract him from his professional responsibilities.

Despite my assurances to Complainant that we, his management, had put the Reed incident behind us and that nothing adverse to him would arise from it, and verbal advice to let it drop, Complainant sent an October 29, 1998 letter, on official EPA letterhead, to the President of the University of Maryland. NCEA management found out about this letter only after its receipt by the University and subsequent telephone complaints of harassment by Ms. Reed.

The letter made criminal accusations against Ms. Reed, suggested that her faculty advisor was also culpable of academic fraud, demanded from the University academic records of hers, and threatened a referral to the Agency's Office of Inspector General should the University fail to produce the documents requested. This letter was quite embarrassing to EPA, generally, and to ORD specifically, and the Director of NCEA apologized for, and repudiated, it almost immediately.

The Agency's subsequent decision to give Complainant a formal letter of reprimand was based exclusively on his conduct related to sending the October 29th letter. He misrepresented and embarrassed the Agency, as well as failed to comply with supervisory instructions about ceasing activity on NCEA-W matters related to Ms Reed. There was no Agency consensus that such a modest disciplinary action as a letter of reprimand was sufficient, as some who were consulted in EPA recommended a multi-day suspension. Ultimately, Michael Callahan, the Director of NCEA, decided to issue only the letter of reprimand.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.. Executed on March 26, 2001.

_____
Charles H. Ris, Deputy Director
National Center for Environmental Assessment-
 Washington Office
Office of Research and Development