RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

2007 JUN 12 PM 11: 44

NANCY M.
MAYER-WHITTINGTON
CLERK

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Dr. James T. Walker, ) | |
| ) | |
| ) | |
| ) | |
| **PLAINTIFF** ) | |
| ) | |
| ) | |
| **v.** ) | Civil Action |
| ) | No.05-2118 (RMC) |
| ) | |
| ) | |
| Stephen L. Johnson, Administrator ) | |
| US Environmental Protection Agency ) | |
| ) | **RECEIVED** |
| ) | |
| ) | JUN 1 2 2007 |
| **DEFENDANT** ) | |
| ) | NANCY MAYER WHITTINGTON, CLERK |
|  | U.S. DISTRICT COURT |

## PLAINTIFF'S MOTION TO DENY DEFENDANT'S MOTION TO DISMISS
## OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

In February 2007, Defendant filed a Motion to Dismiss or In the Alternative for

Summary Judgment the above captioned case.  Dr. Walker hereby files his response to that

Motion.  Dr. Walker moves this Court for an order denying Defendant's Motion.  In

support of his Motion, Dr. Walker submits the attached memorandum of points

and authorities with exhibits, a statement of material disputed and undisputed facts.

Respectfully Submitted,

James T. Walker, *Pro Se*
136 West Quail Lane
La Plata, Maryland 20646
(301) 654-6376

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Dr. James T. Walker, | ) |
| | ) |
| | ) |
| **PLAINTIFF** | ) |
| | ) |
| | ) |
| v. | ) |
| | ) Civil Action |
| | ) No.05-2118 (RMC) |
| | ) |
| | ) |
| Stephen L. Johnson, Administrator | ) |
| US Environmental Protection Agency | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| **DEFENDANT** | ) |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS MOTION TO DENY DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

Plaintiff, Dr. James T. Walker, ("Dr. Walker") is a Black African-American male, who is an employee at the USEPA ('the Agency"), files this action to address a continuous pattern discrimination on the accounts of race, sex and retaliation. He alleges that the Defendant discriminated against him by:1) issuing him a letter of reprimand "L of R" for sending a letter of inquiry to the University of Maryland; 2) not selecting him for a GS-14

Environmental Scientist position for which he applied and was qualified; 3) putting him on force administrative leave, creating a violence in the workplace file on him because of a false allegation that was made by his summer intern; 4) sending the Agency lawyer a copy of the L of R that was supposed to be destroyed; 5) sending him a admonishment email after he had sent a global email to staff and line manager inquiry about conflict of interest issues; and 6) not taking the L of R earlier. As set forth below, Dr. Walker asserts that here remains genuine issues of material fact in dispute, which should go to trial.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Dr. Walker hereby incorporates and relies on the record facts as provided in his statement of disputed and undisputed facts as to which there is a genuine dispute.

## II.    ARGUMENT

### A.    Legal Authority and Standards

Rule 8(a)(2)requires only that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief." In an employment discrimination case, the "plaintiff need not set forth the elements of a prima facie case at the initial pleading stage." Sparrow v. United Airlines, Inc, 216 F.3d 1111, 1111 (D.C. Cir. 2000). The Court will not grant a motion to dismiss for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Accordingly, at this stage of the proceedings, the Court accepts as true all of the complaint's factual allegations, and draws all reasonable inferences in favor of plaintiff. Hishonv. King & Spalding, 467 U.S. 69, 73 (1984). However, the movant is entitled to judgment if there are

no allegations in the complaint which, even if proven would provide a basis for recovery. *Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C. Cir. 1987).

Title VII makes it an "unlawful employment practice" for an employer to discriminate against an individual "because of such individual's race, color, religion, sex, or national origin,"42 U.S.C. § 2000e-2(a)(1), or "because he has opposed any practice made an unlawful employment practice by this sub chapter," *id.* § 2000e-3(a). Absent direct evidence of intentional discrimination or retaliation, *see, e.g., Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002), an employee can establish a prima facie case of an unlawful employment practice under the "single motive" or "pretext" framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248(1981), if he proves by a preponderance of the evidence that he "applied for an available position for which [he] was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination [or retaliation]." *Burdine*,450 U.S. at 253; *see McDonnell Douglas*, 411 U.S. at 802. The burden of production then shifts to the employer to rebut the presumption of discrimination or retaliation by presenting evidence of a legitimate reason for its employment decision. *See Burdine*, 450 U.S. at 254; *McDonnell Douglas*, 411 U.S. at802. The employee retains the ultimate burden of persuasion and may prove intentional discrimination or retaliation by demonstrating that the employer's proffered legitimate reason is pre-textual and not the "true reason" for the employment decision. *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411U.S. at 804.

For a retaliation claim, plaintiff must establish that (1) he engaged in a statutorily protected activity; (2) the Defendant took adverse personnel action; and (3) a causal

connection existed between the two. Rochon v. Ashcroft, 319 F.Supp. 2d 23, 30 (D.D.C. 2004) (Lamberth, J.). The anti-retaliation provision under Title VII seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. *Robinson,* 519 U. S., at 346. It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. The anti-retaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace. The provision covers those employer actions that would have been materially adverse to a reasonable employee that could well dissuade that employee from making or supporting a charge of discrimination. Burlington N. & S *F R. Co. v. White* 364 F. 3d 789 (2006).

A person who believes that she has been discriminated against on the basis of race, color, religion, sex or age must seek informal resolution of the matter by consulting an EEO Counselor within 45 days of the date of the matter alleged to be discriminatory. 29 C.F.R. § 1614.105(a)(1). This time period may be extended "when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them, that he or she did not know and reasonably should not have known that the discriminatory matter or personnel action occurred, [or] that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counselor within the time limits[.]" 29 C.F.R. § 1614.105(a)(2). The failure to exhaust administrative remedies is an affirmative defense and therefore the defendant bears the burden of proving the plaintiff's failure to exhaust administrative remedies. Aceto v. England, 328 F. Supp. 2d 1, 4 (D.D.C. 2004);Armstrong, 172 F. Supp. 2d at 20. Failure to exhaust administrative remedies by allowing the 45-day tolling period to elapse is not a jurisdictional defect but rather operates

like a statute of limitations that may be tolled for equitable reasons. Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982); Stewart v. Ashcroft, 352F.3d 422, 425 (D.C. Cir. 2003). The plaintiff bears the burden of pleading and proving equitable reasons for noncompliance. Bayer, 956 F.3d at 332; McCants v. Glickman, 180 F. Supp. 2d 35,39 (D.D.C. 2001). This Circuit has consistently held that equitable tolling should only be granted in "extraordinary and carefully circumscribed circumstances." Mondy v. Secretary of the Army,845 F.2d 1051, 1057 (D.C. Cir. 1988); see also Washington v. Washington Metro. Area Transit Authority, 160 F.3d 750, 753 (D.C. Cir. 1998); Smith-Haynie v. Dist. of Columbia, 155 F.3d 575,579-80 (D.C. Cir. 1998).

Generally, a federal employee must contact an agency equal employment opportunity ("EEO") counselor within forty-five days of an alleged act of employment discrimination in order for the claim to be timely. 29 C.F.R. § 1614.105(a)(1). However, in a pattern and practice suit where there is a continuing violation, a plaintiff may "litigate claims that fall outside of the time filing requirements if he proves either a 'series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during the statutory period." Pleasants v. Allbaugh, 185 F.Supp. 2d 69, 73 (D.D.C. 2002) (quoting Palmer v. Kelly, 17 F.3d1490, 1495 (D.C. Cir. 1994)); see Anderson v. Zubieta, 180 F.3d 329, 337 (D.C. Cir. 1999) ("Where . . . discrimination is not limited to isolated incidents, but pervades a series or pattern of events which continue to within [45] days of the filing charge. . ., the filing is timely . . . regardless of when  the first discriminatory incident occurred.") (quoting Laffey v. Northwest Airlines, 567 F.2d 429, 473 (D.C. Cir. 1976)). Claims dating back to the inception of the continuing violation may be pled. See EEOC v. Dial Corp., No. Civ. A. 99C3356, 2002

WL 1974072, at*4 (N.D. Ill. July 23, 2002) (allowing to proceed in the litigation any claims falling within the time period of the violation); see also Anderson, 180 F.3d at 337 n.10 (noting that plaintiffs may "recover for portions of the persistent process of illegal discrimination that antedated the limitations period.")(quoting McKenzie v. Sawyer, 684 F.2d 62, 72 (D.C. Cir. 1982)).

### B.    Dr. Walker's Complaint States Claims for Which Relief Can be Granted

#### 1.    The Kathleen Reed Incident

On or about August 27, 1998, Ms. Kathleen ("Reed"), a summer intern from the University of Maryland ("U of M"), while working for Dr. Walker, who was Reed's supervisor and project leader, asked him to include her and her advisor's name, Dr. Whitehead, and their publications in a research proposal that was submitted by Dr. Fatimah Jackson, another researcher from the university. Reed also asked Dr. Walker to include her name on the proposal as a principle investigator and a recipient of funds. Dr. Walker refused and told her that it was against federal law for her to make such a request to a government official and, because she had done nothing to finish her project, she had to leave the Agency. Reed responded loudly by saying that he had "raped" her and that she was not going to leave. Dr. Walker left her cubicle and returned to his office and called his supervisor Dr. Sonawane about the incident. He later was informed that Reed had told his managers that during **the** discussion "....Dr. *Walker had turned towards her in a threatening manner.*" Dr. Walker was immediately questioned by a panel of White managers, put on "forced" administrative leave or suspension, and a "Violence in the Workplace" file was created on him, which still remains in his records at the Agency. Dr. Walker was also relieved of his supervisory responsibilities and the entire minority

internship program was eliminated. This was done despite the fact that Reed told these managers that he did not verbally threaten or physically touch her and there was no evidence or facts to support Reed's allegation. Reed was not suspended and questioned like Dr. Walker and no "Violence in the Workface file was created on her. Furthermore, NCEA managers did not contact anyone at the University of Maryland about Reed's attempts violate federal law. Because of the differences in how NCEA managers treated Dr. Walker compared to Reed and similarly situated white scientists in NCEA, Dr. Walker contacted an EEO counselor and filed a discrimination complaint on the basis of race and sex.

The Defendant asserts that the Dr. Walker's supervisor's attempts to diffuse the tension between him and the intern by sending them home did not give rise to the level of adverse personnel actions or create an inference of discrimination or retaliation. Dr. Walker disagrees and asserts that his managers' actions creates and inference of retaliation. It is undisputed that there have been many open disagreements and discussions in his office between similarly situated white scientists, when in some cases came very close to blows. However, the managers did nothing. In addition, they did not force the individuals to face a panel of managers and go home on administrative leave for a cooling off period. They also did not call the labor relations person over or create a "Violence in the Workplace" file on the individuals. Furthermore, the white scientist did not loose their supervisory position and an entire program was not eliminated because of an unsubstantiated allegation that was put forth by another individual. As stated in the above, the anti-retaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace. The provision covers those employer actions that would have been materially adverse to a reasonable employee that could well dissuade that employee from

making or supporting a charge of discrimination. The actions taken by the managers to retaliate against Dr. Walker.

### 1.    The December 3, 1998 Letter of Reprimand

Within days after contacting the EEO counselor regarding the issue addressed in the paragraph above, Dr. Walker, in his official capacity as an Agency employee, followed up on the matter regarding Reed's request to be included in Dr. Jackson's research proposal. He sent a letter of inquiry ("L of I")to the °U of M", under an EPA letterhead, requesting information ∴:t Reed and her scientific and research credentials. The purpose of the letter was to determine if there was sufficient evidence to cause him to contact EPA's Office of the Inspector General. This letter was sent, pursuant to normal Agency procedures and rules and after he obtained advice from Richard Drummond, an attorney from EPA's Office of General Counsel. On December 3, 1998, Dr. Walker received a Letter of Reprimand (" L of R") from Michael Callahan, Director, National Center for Environmental Assessment-Washington Office ("NCEA-Wash") for sending that letter.

The Defendant asserts that Callahan reprimanded Dr. Walker for allegedly refusing to comply with instructions, for misrepresenting his status as an official representative of the Agency conducting official business, and for misuse of Agency letterhead for unauthorized business. Dr. Walker disputes these assertions and argues that there is no scintilla of evidence to support any of them.

There is, however, a preponderance of evidence which suggest that the real reason why Callahan issued the reprimand was to retaliate against Dr. Walker for filing previous complaints against him and his managers. First, it is undisputed that there was a clear causal link between Dr. Walker's previous EEO activity and the L of R. Callahan issued

the L of R within weeks after Dr. Walker had filed his complaint against NCEA managers because of the Reed Incident (Exh#I , Exh# II). Second, the Defendant did not produce any evidence that Dr. Walker refused to comply with his managers instructions. Third, there is no evidence that Dr. Walker misrepresented his status as an official representative of the Agency. He clearly stated in the letter that the inquiry was on his behalf. Fourth, there is no evidence that Dr. Walker misused the Agency letterhead for unauthorized personal business. The letter clearly addressed EPA business. Fifth, the Defendant did not produce any evidence showing that Dr. Walker violated EPA policy by sending the letter. In fact, - Dr. Walker sent his managers an email asking for guidance on the use of EPA letterheads and got no response.(Exh#III ). Sixth, Dr. Walker used EPA letterheads prior to the L or R to communicate with scientists in academia. Seventh, no other similarly situated scientist in Dr. Walker's office was reprimanded for using an EPA letterhead for official business. Eighth, the letter and action took by Callahan and an NCEA manager also violates the Whistle Blower's Act.

### 2.    Non-Selection to the GS-14 Environmental Scientist Position

On or about December 1997, Dr. Walker applied for a GS-14 Environmental Scientist position in the Office of Child Health Protection (OCHP) at the Agency. Ms. Kelly ("Kelly"), a white female, was the Subject Matter Expert (SME) responsible for rating and ranking the applicants and Ms. Romano Trovato ("Trovato"), a white female, who was the Director of OCHP, was the selecting official. Kelly, after having received and

reviewed the applications for this position, under the direction of Trovato, changed the selection criteria by eliminating the "health physics" requirement. After removing that criterion, and without sending out a new job announcement and receiving new applications, Kelley rated and ranked the applicants, and selected Ms. Paula Goode ("Goode"), a white female, for the position. Dr. Walker was rated sixth out of the ten applicants and was not rated "highly qualified and selected because Trovato and. Kelley discriminated against him due to his race, sex and retaliation because of his previous EEO activities.

Defendant asserts that Dr. Walker allegation fails because it does not state a claim for which relief can be granted. Dr. Walker disputes that assertion. First, he met his burden of showing prima facie discrimination. Evidence in the records show that he was qualified for the position. It is undisputed that, pursuant to the vacancy announcement and the summary rating and ranking sheet for the position, Dr. Walker met the minimum qualification requirements for the position. The vacancy announcement stated: Qualification Requirements: For the GS-14: Applicants must posses at least one year of directly related experiences equivalent to the GS-13 level." (Exh#IV)  Prior to applying for the position he had worked close to 13 years at the GS-13 level as an environmental scientist. (Exh#V ) The SME gave Dr. Walker a rating score of "2.21," which fell in the "Q= Qualified" category (Exh#VI ).  Second, despite having superior qualifications, he was not put on the "highly qualified" list and not selected for the position.

Dr. Walker also met his burden of showing that he was rejected under circumstances which give rise to an inference of unlawful discrimination [retaliation]. First,  there was a clear causal link between his previous EEO activity and the current action. It is undisputed that he had previously filed EEO complaints against ORIA mangers. (Exh #VII) Second, there

is undisputed evidence in the record which shows that both Kelly and Trovato were aware of Dr. Walker's EEO activity. Trovato, was involved in and authorized the settlement agreement resulting from two previous complaints that were filed against Trovato's mangers, when she agreed to promote Dr. Walker to a GS-13/10 .(Exh #VIII )     Third, there is evidence in the record which suggest that the selectee, did not meet the minimum requirements for the GS-14 position for which she was selected. Pursuant to OPM regulations and the vacancy announcement, for the GS-14 position, the applicants "must posses at least one year of directly related experiences equivalent to the GS-13 level." Paula Goode did not meet that criterion. The undisputed facts show that she only worked **six months** at the GS-13 level. Her resume indicated that she promoted from GS 12/8 to GS-13/4 in 6/97 and worked at that level until she applied for the position in question (from "6/97 to present") (Exh #IX ).     Fourth, Dr. Walker's educational qualifications and experiences were far superior to all of the candidates who made the GS-13 and GS-14 Certificate ("cert").    He had a B.S. and M.S. in Physics and a Ph.D in Radiation Biophysics.  He had worked as a senior environmental scientist with the EPA for 13 years. The selectee had no degree.  She had only taken 30 credit hours in science courses.  Denny Cruz, the other applicant who made the GS-14 level cert had a B,S. degree in chemical engineering.  Robin Anderson, who made the GS-13 cert had a B.S. and M.S. in electrical engineering.  Dr. Walker is the only applicant who had extensive experience in developing and applying scientific models and concepts related to children's health. Fifth, Kelly's statement that she had "no knowledge of the applicants' races at the time they were rated" lacks creditability. Although the application packages did not specifically ask for race, there was enough information in them for Kelly to ascertain the race of each applicant. For

example, in Dr. Walker's, application, he indicated that he obtained B.S. and M.S in Physics from Howard University, which is well known historical Black university. He also indicated that he was a member of the National Society of Black Physicist and Blacks in Government. One can infer from reading his resume that he was Black. As another example, one could infer from Denny Cruz's name alone that he was Hispanic. But, when his application indicated that he obtained a B.S. in Chemical Engineering from the University of Puerto Rico, and that he was Physics Instructor at the University of Puerto Rico, and worked on Puerto Rico Environmental Quality Board, this is sufficient information for one to conclude that Cruz was Puerto Rican or Hispanic. Furthermore, with regards to Robin Anderson's race, when the application showed that she obtained a B.S. in Electrical Engineering from North Carolina A&T and M.S. in Electrical Engineering from Howard University, and included the statement **"I am an active member in the National Association for the Advancement of Colored People (NAACP),"** this should be sufficient information for one to infer that Anderson was a Black AA female. This information attacks Kelly's creditability and provides further support that the real reason was discrimination. Sixth, Kelly's and Trovato's indicating that they "did not know who the applicants were at the time the rating criteria were changed " lacks creditability. Dr. Walker disputes the statements made by Kelly and Trovato that they did not know the identities of the applicants for the position at the time they decided to excise the "health physics" requirement. The undisputed evidence shows that at the time the announcement was created and the decision made to excise that requirement, Kelly and Trovato knew one of the applicants, Paula Goode, the selectee, because she was on detail from ORIA in the OCHP working alongside both of them as Trovato's assistant (Exh#X ) and, of course was

"wired" for the position. Furthermore five of the applicants, including Plaintiff, worked directly under Trovato when she was the ORIA Director (Goode, Walker, Anderson, Kwan-Yei, and Barron). Seventh, Kelly and Trovato perverted the fairness of the selection process by "wiring" the position for an applicant who failed to meet the minimum requirements for the position. Eight, Kelly's point system for rating the applicants was subjective and it masked her intent to discriminate. According to the rating sheets, Kelly was required to identify and list the bases for each individual's rating (Exh #XI). She failed to do that. (Exh # XII ) and her ratings, which relied heavily on subjective considerations, are untrustworthy. Finally, Kelly did not consider his Dr. Walker 5 points veteran's preference for serving in the U.S. Air Force.(Exh #XIII ).

### 3.    Admonishment Notice from Management for Sending A Global Email

While the previously mentioned complaints in the above paragraphs were still being considered by EEOC, on or about June, 2004 the office of Research and Development published a list containing names of individuals who received cash awards, as a result of the ORD's STAA competition. (Exh #XIV ). Dr. Walker, who submitted a scientific paper for the competition, was a bit suspicious, because the list primarily contained names of individuals who were either program directors/managers or persons who controlled the research "purse strings" in NCEA/ORD, or personal friends of those individuals. On its face, it appeared to Dr. Walker that his was a clear conflict of interest situation, in addition to being discriminatory, because the awards were given to only white scientists and those who were in position to control EPA funds and actually benefit from the distribution of those funds. During June, 2004, Dr. Walker sent a global email to top level managers and scientists to have the Inspector's Generals Office to this matter by General to provide a

15

reading, because it appeared to be discriminatory and an apparent conflict of interest.(Exh
# XV) In response to the "global" e-mail, on June 25, 2004, under the direction of Drs.
Preuss and Alapas, Mr. Charles Ris sent Dr. Walker an e-mail message admonishing,
reprimanding, and threatening him for sending it (Exh #XVI). This e-mail of
admonishment has been and is still being maintained in Dr. Walker's file in NCEA,
despite the fact that there is no EPA policy that specifically addresses the proper use of e-
mails.( Exh #XVII ). Dr. Walker alleges that Drs. Preuss and Alapas, and Mr. Ris issued
the e-mail and have maintained it in his file because retaliation for his participation in
previous EEO activities.

It is the Defendants positions that with regards to this issue that Dr. Walker failed to
exhaust his administrative remedies. Dr. Walker disagrees. It is an undisputed fact that
Dr. Walker failed to contact an EEO counselor within 45 days of the admonishment email
in June, 2004 from NCEA managers. He did not attempt to initiate administrative
proceedings until approximately a year later, a point significantly greater than 45 days after
the email was sent to him. However, the 45-day time limit should have been extended by
EPA's Office of Civil Rights ("OCR"). Just after the admonishment email was sent to Dr.
Walker, he immediately contacted the Agency's Deputy Chief of Staff, Ray Spears, to
determine if he violated any EPA policies by sending the "global" email (Exh. #XVIII ).
Spears referred that email to EPA's Office of Resource Management who did not contact
Dr. Walker with a final answer until about a year later. This was after Dr. Walker had sent
many follow-up emails. The official response from the Agency was that there were no
policies in place with regards to emails (Exh. #XVIX). It was then when Dr. Walker
determined that he was discriminated against by his managers. (Exh # XX).    Because Dr.

Walker had an equitable reason for his noncompliance with the 45-day rule, he did properly exhaust his administrative remedies before filing this complaint in this Court. His complaint should have been accepted and processed by EPA's OCR. The Defendant further asserts that this claim fails to rise to the level of actionable claims. Dr. Walker disagrees. As stated in the above, the anti-retaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace. The provision covers those employer actions that would have been materially adverse to a reasonable employee that could well dissuade that employee from making or supporting a charge of discrimination. The admonishment email, in addition to the other actions taken against Dr. Walker, represents the many attempts by NCEA managers to dissuade Dr. Walker from speaking up and addressing civil rights related issues.

There is further evidence which give rise to an inference of unlawful discrimination with regards to this issue. In contrast to Dr. Walker's e-mail which addressed official office business, other similarly situated employees within Dr. Walker's office have sent and are still sending out "global" e-mails of personal and non-business nature, but have not received admonishments, reprimands, or threats from NCEA managers (Exh #XXI , Exh#XXII , Exh #XXIII, Exh #XXIV). Ris' admonishment e-mail has adversely impacted Dr. Walker's ability to directly communicate freely regarding office matters with other managers and scientists within and outside NCEA's office and it was intended to dissuade Dr. Walker.

### 4. Ris's and Callahan's Refusal to Remove the L of R Early.

The reprisal continued after the letter of reprimand was issued. On or about June, 2000 Dr. Walker approached his then first line supervisor, Charles Ris, and asked him why

the letter of reprimand was still in his files, since the issuing managers told him that it could be taken out before the recommended two year period ended. Ris made the following statement: "I do not know. You are still filing all of those EEO complaints." He told the EEO counselor that he made that statement to Dr. Walker (Exh# XXV ).  As a follow-up, on September 15, 2000, Dr. Walker asked Mike Callahan, his ex-supervisor, to remove the letter of reprimand from his files. Callahan's answer implied that the letter would remain in his files until December,2000, because of the previous complaints that he filed against him and other -NCEA managers. This is clearly reprisal and a violation of the Civil Right Act.

### 5.    It is Undisputed that Ris's and Starr's Used the L of R to Retaliate Against Dr. Walker.

On or about December, 21, 2000, Dr. Walker filed a class complaint against the Defendant alleging discrimination based on race, sex, and retaliation. As the class complaint was being processed administratively through EEOC, on or about August  2001, Dr. Walker learned that his second line supervisor, Mr. Charles Ris ("Ris"), (Dr. Walker's second line supervisor) sent  Mr. Charles Starr ("Starr") a copy of the L of R. Starr represented the Agency in Dr. Walker's class action suit.  Ris admitted to the EEO counselor that he sent a copy of the letter to Starr. (Exh. # XXVI).  According to Agency rules, the "L of R" should have been removed from Dr. Walker's files close to 8 months earlier, by December 8, 2000, and not have been used or referred to by his managers, <u>unless</u> they were taking subsequent  adverse personnel actions against him. (Exh # XXVII).  Ris violated that rule.  Dr. Walker alleges that Ris sent that a copy of the  L of R to Starr solely for the purpose of letting Starr use it to oppose Dr. Walker's class action suit and to retaliate against him for his involvement in that and previous EEO activity.   Starr in response brief to the Equal Employment Opportunity Commission (EEOC), stated the

18

charges contained in the letter of reprimand as facts, not allegations, and, without any supporting evidence, defamed Dr. Walker's name and reputation and negatively impacted his role as class agent. As a result, the class complaint was not certified. The Defendant in his Motion to Dismiss or in the Alternative for Summary Judgment did not dispute Dr. Walker's allegation of discrimination with regards to this issue. It is clear that Ris sent the letter to Starr to dissuade or prevent Dr. Walker from making or supporting his class action law suit of discrimination. Because the Defendant failed to respond to this claim, it remains a genuine issue that should go to trial.

## CONCLUSION

Plaintiff complaint should not be dismissed because there are issues of material fact in dispute that should go to trial.

Respectfully Submitted,

James T. Walker, *Pro Se*
136 West Quail Lane
La Plata, Maryland 20646
(301) 654-6376

## CERTIFICATE OF SERVICE

I, James T.  Walker, hereby state that I have mailed a copy of this

**"PLAINTIFF'S MOTION TO DENY DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT "**

on this date June 12, 2007 to the following address:

Alexander D. Shoaibi
555 4th Street N.W.
Washington, DC. 2001

*James T. Walker*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Dr. James T. Walker, | ) |
| | ) |
| | ) |
| **PLAINTIFF** | ) |
| | ) |
| | ) |
| v. | ) |
| | )    Civil Action |
| | )    No.05-2118 (RCM) |
| | ) |
| | ) |
| Stephen L. Johnson, Administrator | ) |
| US Environmental Protection Agency | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| **DEFENDANT** | ) |

## PLAINTIFF'S STATEMENT OF MATERIAL FACT
## AS TO WHICH THERE IS A GENUINE DISPUTE

In support of the Plaintiff's Motion to Oppose Defendant's Motion to Dismiss

and in the Alternative for Summary Judgment, pursuant to Local Rule(), Plaintiff submits

the following statement of material fact to which there is a dispute:


1.      In July, 1994 Plaintiff filed a discrimination complaint against the Margo

Oge, Director of the Office of Radiation and Indoor Air (ORIA) based on reprisal,

nepotism, national origin and race . (Ex #A.)

2.    On or about August 1994, Margo Oge was upset about the charges that were

lodged against her (Ex #..) and was reassigned to the Office of Global Sources and

replaced by her personal friend Ramona Trovato, who served in an acting or temporary

capacity until she was permanently assigned to ORIA in February 1995. (Ex #B.)

3.    Plaintiff disputes the statement in Trovato's affidavit where she claims that ...at

no prior time, had ever worked in the same office as Complainant, I had no knowledge of

his EEO history.." Thus contrary to Complainant's suggestion that I was familiar with

his prior EEO advocacy...I have never had any familiarity with his EEO history, other

than his complaint that he has filed against me ........ I subsequently became aware that

Complainant wanted me to promote him to a GS-14 as part of the transfer of his FTE to

ORD" It is undisputed that Plaintiff worked directly under Trovato for close to six

months prior to going on detail to ORD in early 1995. It is also undisputed that while on

detail, Plaintiff was approached by an Agency lawyer indicating Trovato's willingness to

settle his previous complaints against ORIA managers and that , although Plaintiff had

requested a promotion to a GS-14 position, on April 30, 1995, he agreed to settle the EEO

cases by accepting a within grade increase to a GS-13/10, which was authorized and

signed by E. Ramona Trovato, the ORIA Office Director in April 1995. (Ex #C.)

4.    Plaintiff disputes the statement in Trovato's affidavit where she claims that

"there was no conspiracy with Ms. Kelly to pervert the fairness of the selection process

on Vacancy Announcement No. 8-0A-9014...There is absolutely no truth, however, to

such a scurrilous suggestion..." The undisputed evidence show that Goode, who was

working

for Trovato at the time the announcement was published, was ranked high qualified by Kelly and selected by Trovato, despite the fact that Goode failed to meet the minimum qualifications requirements for the GS-14 position.

5.    Plaintiff disputes the statement in Trovato's affidavit where she claims that she ".. was motivated to delete "health physics," not by any nefarious scheme to discriminate against Complainant, but rather by my commitment to ensure the selection of the best

qualified applicant." The undisputed evidence shows that Trovato et al, changed t requirements the position without renouncing it and by doing so ....the non-selection of those individuals in the applicant pool ₁who had extensive experience in the "health physics" field ,and the selection of those individuals who did not

6.    Plaintiff disputes the statement in Trovato's affidavit where she claims that "there was no conspiracy with Ms. Kelly to pervert the fairness of the selection process on Vacancy Announcement No. 8-0A-9014...There is absolutely no truth, however, to such a scurrilous suggestion..." The undisputed evidence shows that Goode, who was working for Trovato at the time the announcement was published, was ranked highly qualified by Kelly and selected by Trovato, despite the fact that evidence in the record suggests that Goode failed to meet the minimum requirements for the position.

7.    Plaintiff disputes the statement in Kelly's affidavit where she states that she had "no knowledge ..whether they had filed EEO complaints." . Kelly worked alongside of and was with Trovato when she signed the settlement agreement resulting from the EEO complaint that Plaintiff had filed against Oge and her managers.

8.    It is undisputed that in August, 1995, Plaintiff was reassigned to ORD. (Ex #..)
and  E. Ramona Trovato became EPA's Office of Children's Health Protection,(OCHP)
Office Director during the years between 1994-1997.

9.    In December 1997, the EPA OCHP published a vacancy
Announcement for the position of Environmental Scientist in EPA's Office of Children's
Health Protection, pursuant to vacancy announcement 8-OA-9014.

10.    All applicants had to meet the minimum  time-in-grade qualification
requirements within 30 calendar days of the closing date of the announcement and that
applicants for the GS-14 position can qualify for that position and  at least one year of
directly related experience equivalent to the GS-13 level. It further stated that
applicants who do not meet the above qualification requirements will not be evaluated
to determine the extent of their knowledge , skills and abilities for the position. (Ex
#D)

11.    Margret Kelly was the Subject Matter Expert (SME) and had the responsibility
for ranking the applicants for submission to Ramona Trovato, who was the selecting
official for the position.  Francine Butler was the Personnel Management Specialist who
issued the vacancy announcement and received the applicants' packages.

12.    It is undisputed that the duties and responsibilities that were advertised in the
vacancy announcement were almost identical to those that were being performed by
Goode in her detail in the OCHJP. (Ex #E.)

13.    It is undisputed that sometime after the vacancy announcement was issued and
the applicants had sent in their applications, Kelly and Trovato decided to excise the
"health physics" requirement from under KSA #1.

14.     Plaintiff disputes Defendant's assertions that Kelly and Trovato did not know the identities of the applicants for the position at the time they decided to excise the "health physics" requirement. At the time the announcement was created and this decision made, Kelly and Trovato knew Paula Goode, the selectee, because she was on detail from ORIA in the OCHP working alongside both of them as Trovato's assistant (Ex #F) Furthermore five of the applicants, including Plaintiff, worked directly under Trovato when she was the ORIA Director.

15.     It is undisputed that the announcement was not reissued.

16.     Plaintiff disputes as to whether the applicants were evaluated on the same basis because the duties and responsibilities that were advertised in the vacancy announcement were almost identical to those that were being performed by Goode in her detail in the OCHJP. (Ex #G)


17.     Plaintiff disputes Defendant's assertions that the SME deemed Paula Goode, a white female and Robin Anderson, a black female, and Denny Cruz, a Hispanic, as "highly qualified" for the GS-14 position, for which Plaintiff applied. Kelly deemed Paula Goode, a white female and Denny Cruz, a Hispanic male for the position that Plaintiff applied for. She deemed Robin Anderson, a black female, as "highly qualified" for the GS-13 position.

18.     It is undisputed that Paula Goode's and Denny Cruz's names appeared on the GS-14 cert (Exh #H) . It is also undisputed that Goode was selected from that cert.

19.     Plaintiff disputes Defendants assertion that Goode was "highly qualified" for the position.

20.     Goode's resume showed that she did not meet the <u>minimum requirements</u> for the

GS-14 position for which she was selected, because she had worked only <u>6 months</u> at the GS-13 level (from 6/97- 12/97).

21.    Although Goode was highly rated by Kelly and selected by Trovato, she was the **only** applicant who failed to meet the <u>minimum requirements</u> for the GS-14 positions. ( Exh # I )

22.    Francine Butler, Margret Kelly, and Trovato ignored OPM's Operating Manual for Qualifications Standards of General Schedule Positions by allowing Goode, the white female, to be rated and selected for the position without her meeting the minimum time-in-grade qualification requirements.

23.    Plaintiff disputes as to whether Kelly had no knowledge of the applicants' races at the time she ranked them. Goode was on detail to Trovato's Office working alongside of Kelly and Trovato as an assistant office director. So Kelly had to know that Goode was white. Plaintiff's package indicated that he obtained his BS and MS from Howard University, which is a historical black college. He also indicated that he was a member of Blacks in Government and the National Society of Black Physicist. Robin Anderson also graduated from HBCU and indicated that she was a member of the NAACP. One can infer from Denny Cruz's name alone that he is Hispanic and from resume which indicated that he was from Puerto Rico and spoke and taught fluent Spanish. Kung-Wei of course, is an Asian American.

24.    Plaintiff had 15 working years in applying the principles, theories and practices of environmental science, a Ph. D in Radiation Biophysics, a M.S. in Physics, a B.S. Physics., While Paula Goode worked 6 years as an environmental scientist, she did not do any work related to the applying the principles, theories and practices of science.

Respectfully Submitted,

James T. Walker, *Pro Se*
136 West Quail Lane
La Plata, Maryland 20646
(301) 654-6376

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Dr. James T. Walker,<br><br>**PLAINTIFF**<br><br>v.<br><br><br>Stephen L. Johnson, Administrator<br>US Environmental Protection Agency<br><br><br><br>**DEFENDANT** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action<br>)    No.05-2118 (RMC)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACT

In support of the Defendant's Motion to Dismiss, or in the Alternative for Summary Judgment, and pursuant to Local Rule 7.1(h), Defendant submitted a statement of material fact.  Below is Plaintiff's response to what the Defendant submitted:

1. <u>Plaintiff does not dispute this purported fact</u>.

2. <u>Plaintiff does not dispute this purported fact</u>.

3. <u>Plaintiff disputes this purported fact</u> .  Defendant  has no way of verifying this statement.  All statements in the record as to who suggested to the selecting

official that the "health physics" portion of the first evaluation criterion was unnecessary to the position and should be eliminated lacks creditability.

4.    <u>Plaintiff disputes this purported fact.</u>  Since there is strong evidence in the records to indicate that the position was "wired"[created specifically for Paula Goode], the selectee, both Kelly and Trovato were at least aware of Goode's identity, because she was working alongside of these individuals when the job announcement was created and published (Exh #i).  Furthermore Goode's duties and responsibilities outlined in the announcement and the final position description almost exactly matched those that were found in Goode resume.(Exh #ii)

5.    Plaintiff disputes this purported fact.  Defendant has no way of confirming this statement.  However, according to OPM regulations, the vacancy announcement was supposed to be reissued and announced again before the position was filled.

6.    <u>Plaintiff disputes this purported fact.</u>  There is no evidence to prove that all of the applicants were evaluated based on the same criteria, because Kelly failed to provide a basis for her ratings for each of the ranking factors. (Exh #iii )

7.    <u>Plaintiff disputes this purported fact.</u>  Two of the individuals deemed "highly qualified" for the GS-14 position were Paula Goode, a white female, and Denny Cruz, a Puerto Rican male. Robin Anderson, a black female, was ranked 'highly qualified" for the GS-13 position. (Exh #iv )

8.    <u>Plaintiff does not dispute this purported fact.</u>  Plaintiff was ranked sixth of the nine candidates and was not placed on the merit promotion certificate or

"best" qualified list for this vacancy announcement. However, he received
the low ranking because Kelly and Trovato discriminated against him.

9.    <u>Plaintiff disputes this purported fact.</u> Goode did receive higher scores. However,
she received the higher scores because Kelly and Trovato discriminated against
Plaintiff.

10.   <u>Plaintiff disputes this purported fact.</u> Plaintiff's sent an attached note indicating
that he alleged that the non-selection represented a continuous pattern of
discrimination. (Exh #v )

11.   <u>Plaintiff disputes this purported fact.</u> The EEOC erred in granting the Agency's
motion for summary judgment against the Plaintiff, which explains why the case
is before this Court.

12.   <u>Plaintiff objects to and disputes this purported fact.</u> There was <u>no</u> evidence
introduced into the record to show that there was an altercation between Plaintiff
and the summer intern and that he had approached her in a threatening manner.

13.   <u>Plaintiff disputes this purported fact.</u>

14.   <u>Plaintiff objects to and disputes this purported fact.</u> There was <u>no</u> evidence
introduced into the record to show that there was an altercation between Plaintiff
and the summer intern. The matter was recorded in EPA's Violence in the
Workplace file under Dr. Walker's name. (Exh #vi )

15.   <u>Plaintiff disputes this purported fact.</u> The Agency ignored the other allegations
that Plaintiff brought forth in his complaint.

16. <u>Plaintiff disputes this purported fact</u>. The EEOC erred in dismissing Plaintiff's complaint, which explains why the case is before this Court.

17. <u>Plaintiff objects to and disputes this purported fact</u>. There was <u>no</u> evidence introduced into the record to show that there was an altercation between Plaintiff and the summer intern.

18. <u>Plaintiff objects to disputes this purported fact</u>. There is no evidence introduced in the record to show that Plaintiff violated management instructions. He does not dispute that the fact that he sent the letter to the President of the intern's university. However, he was not given instruction regarding sending letters to the university. Plaintiff does dispute the suggestion that he needed clearance from EPA management to send such a letter. Plaintiff is a senior scientist at the Agency and there was no policy in place requiring management clearance of such letters that he sent to the university. Plaintiff was advised by a lawyer in the Agency's Office of General Counsel to send the letter, because the summer intern violated federal law by attempting to influence a government official to commit illegal acts. (Exh #vii )

19. <u>Plaintiff objects to and disputes this purported fact</u>. Plaintiff did not threaten the university in any way, when he indicated that "if he did not receive this information "within thirty working days" he would forward the matter to EPA's Inspector General's Office." Plaintiff merely wrote the statement to establish a time limit for a response from the university before determining if it was necessary to contact the IG Office. (Exh #viii )

20. <u>Plaintiff objects to and disputes this purported fact</u>

21. <u>Plaintiff does not dispute this purported fact</u>

22. <u>Plaintiff does not dispute this purported fact</u>.  However, EEOC erred in granting summary judgment on this issue, which explains why the case is currently before this Court.

23. <u>Plaintiff objects to and disputes this purported fact.</u>  EPA's Office of Civil Rights erred in rejecting Plaintiff complaint regarding the email because the amount of time to contact an EEO counselor should have been extended because he was not aware of being discriminate against until May 3, 2005, when he was informed that there was no EPA policy on global emails.

Respectfully Submitted,

*James T. Walker*

James T. Walker, *Pro Se*
136 West Quail Lane
La Plata, Maryland 20646
(301) 654-6376