## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES T. WALKER,                 ) | |
|                           ) | |
|           **Plaintiff,**        ) | |
|                           ) | |
|       **v.**                   ) | **Civil Action No. 05-2118 (RMC)** |
|                           ) | |
| STEPHEN L. JOHNSON,         ) | |
| Administrator, U.S. Environmental   ) | |
| Protection Agency,            ) | |
|                           ) | |
|           **Defendant.**       ) | |
|                           ) | |

## MEMORANDUM OPINION

Plaintiff James T. Walker is an African-American male employee of the U.S. Environmental Protection Agency ("EPA") who sues his employer *pro se* for discrimination on the basis of race, color, gender, and retaliatory animus in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). The administrative processing of Dr. Walker's charges took close to seven years until he received a Right to Sue Letter dated July 29, 2005. He filed suit in October 2005, eight long years after his initial discrimination charge. Defendant Stephen L. Johnson, EPA Administrator, now files a motion to dismiss or for summary judgment, which Dr. Walker opposes. The motion became ripe for decision in June 2007 and the Court moves expeditiously to address it. Because the record contains no evidence of unlawful discrimination or retaliation, Defendant's motion will be granted.

## I.  BACKGROUND FACTS

Dr. James T. Walker is an African-American male who at all times relevant was employed as a GS-13, step 10, Environmental Scientist in the National Center for Environmental

Assessment – Washington Office ("NCEA-W"), in EPA's Office of Research and Development ("ORD").[1]  Dr. Walker's claims can be grouped into two general categories: non-selection for a promotion allegedly based on race, gender, and retaliation; and several discrete acts of alleged discrimination and retaliation based on race and prior EEO activity that, according to Dr. Walker, formed a pattern of pervasive retaliation.

       **A.**     **Alleged Non-Selection Due to Race, Gender, and Retaliation**.

       In December 1997, Dr. Walker applied for a position as a GS-13/14 Environmental Scientist in the Office of Child Health Protection ("OCHP").  Def.'s Statement of Material Facts as to Which There is No Genuine Dispute ("Def.'s Facts") ¶ 1.  Margaret Kelly, a White female, who was a Regulatory Affairs Team Leader in OCHP, acted as the Subject-Matter Expert responsible for rating and ranking the applicants.  *Id.* ¶ 3.  Ramona Trovato, a White female and the Director of OCHP, was the selecting official.  *Id.*  As posted, one portion of the first evaluation factor required experience in the field of "health physics," but Ms. Kelly thought this was an irrelevant criterion for the position and, with Ms. Trovato's agreement, eliminated this factor from consideration.  *Id.*; *see also* Pl.'s Statement of Material Facts as to Which There is a Genuine Dispute ("Pl.'s Facts") ¶ 16.  Ms. Kelly then rated and ranked the applicants and sent three names to Ms. Trovato: Paula Goode, a White female, Robin Anderson, a Black female, and Denny Cruz, an Hispanic male.  *See* Def.'s Facts ¶¶ 7-8.  These candidates received scores from Ms. Kelly of 47, 44, and 44, respectively.  Def.'s Ex. 7.  Dr. Walker's score was 31, and he ranked sixth of the nine applicants overall.  *Id.*; *see also* Def.'s Ex. 17.  Ms. Trovato selected Ms. Goode for the position.  Pl.'s Facts ¶ 23.  On the first

---

[1]  There is no genuine dispute with respect to the facts recited in this Memorandum Opinion unless otherwise noted.

evaluation factor, from which the "health physics" element had been removed, Dr. Walker received

nine out of a possible 12 points, the same score received by Ms. Goode.  Def.'s Ex. 7.

Dr. Walker alleges that Ms. Kelly changed the selection criteria "after having received

and reviewed the applications for this position" in order "to prevent Dr. Walker from being the most

highly ranked applicant and the most qualified for the position."  Compl. ¶ 15.  Ms. Kelly is deceased

and unable to provide testimony or affidavit evidence in this matter.  However, the EPA proffers an

EEO Counseling Report, prepared by EEO Counselor Carolyn G. Epps on her investigation of Dr.

Walker's charge of discriminatory non-selection, which states:

> Telephonic conversation with Subject-Matter Expert [Ms. Kelly].  Did not
> know race of individual and this was not stated on the application.  No prior
> knowledge of [Dr. Walker] or prior EEO complaint.  According to the
> Subject-Matter Expert ranking factor number one was an irrelevant point
> for the job.  The factor was removed before receiving package of
> applications.

Def.'s Ex. 8.  Dr. Walker does not dispute that Ms. Kelly made this statement.  *See* Pl.'s Facts ¶ 28.

Ms. Trovato similarly told the EEO Counselor that "[t]he change to the ranking factor was brought

to her attention by [Ms. Kelly] prior to review of the applications."  Def.'s Ex. 8; *see also* Def.'s Ex.

3 (Trovato Decl.) ("At [the time the health physics criterion was removed], I know for certain that

I was ignorant of who might have applied.").  Moreover, Francine Butler, a personnel management

specialist at EPA, stated under oath that it would have been ordinary EPA procedure for Ms. Kelly

to review the vacancy announcement before the application period closed and, therefore, before she

received any applications to review.  Def.'s Ex. 4.[2]

---

[2] Defendant's Exhibit 8, the EEO Counseling Report that was generated as a result of Dr. Walker's complaint, is admissible as a business record under Fed. R. Evid. 803(5).  And given that (1) Ms. Kelly's statement to the EEO Counselor is corroborated by the sworn testimony of Ms. Trovato and Ms. Butler, (2) Dr. Walker does not contest that Ms. Kelly made that statement, and (3)

At the EEO counselor's request, Ms. Kelly re-reviewed Dr. Walker's application. Def.'s Ex. 8. She noted that he "did not get high points because his application showed straight science application. The ranking factors had a lot to do with the ability to meet and deal with scientific and non-scientific groups outside the agency pertaining to children's health," and Dr. Walker did not present a strong background in the important areas of "[o]ral communications, program management, [and] oversight functions." *Id.*

Dr. Walker also contends that his non-selection was the result of retaliation for prior EEO activity. *See* Pl.'s Amended Motion to Deny Def.'s Motion to Dismiss Or In the Alternative For Summary Judgment ("Pl.'s Mem.") at 14. Specifically, he cites a 1994 discrimination complaint that he filed against his then-manager Margo Oge. Pl.'s Facts ¶ 1. After he filed the charge but before it was resolved, Ms. Oge was transferred to another department and was replaced by Ms. Trovato. *Id.* ¶ 3. Dr. Walker eventually settled his EEO complaint in 1995, and the settlement agreement was authorized and signed by Ms. Trovato. *Id.* ¶¶ 6-7. For her part, Ms. Trovato denies that she knew of Dr. Walker's prior EEO activity at the time she selected Ms. Goode for the Environmental Scientist position at OCHP. *See* Def.'s Ex. 3.

**B.    Discrete Acts of Discrimination and Retaliation**.

In addition to the non-selection, Dr. Walker alleges a series of other adverse actions that he believes constituted a pattern of unlawful retaliation and discrimination. The origins of this claim can be traced to an incident that occurred on or about August 27, 1998. At that time, Dr. Walker was mentoring Kathleen Reed, a summer intern from the University of Maryland. *See* Def.'s

---

Ms. Kelly stated under oath, before her death, that she "did not discriminate or treat [Dr. Walker] differently from the other applicants for the position . . . because of race, color, sex," Def.'s Ex. 5, the Court finds that the statement is admissible under Fed. R. Evid. 807.

Facts ¶ 12.  Ms. Reed asked Dr. Walker to include her name and the name of her faculty advisor, Dr.

Tony Whitehead, and their publications, in a research proposal that was submitted by Dr. Fatimah

Jackson, another researcher from the University of Maryland.  Pl.'s Facts ¶ 65.  "Dr. Walker refused

and told her that it was against federal law for her to make such a request to a government official

and, because she had done nothing to finish her [summer] project, she had to leave" the EPA.  *Id.*

¶ 66.  This response provoked a loud and angry rejoinder from Ms. Reed, who concluded with the

accusation, "Jim you raped me . . . Jim you raped me . . . ."  *See* Def.'s Facts ¶ 12; Def.'s Ex. 11

(Mar. 4, 2000 Walker Affidavit).

        Dr. Walker returned to his office and called his supervisor about the incident.  Pl.'s

Facts ¶ 69.  When Ms. Reed was interviewed, she apparently reported that "'Dr. Walker had turned

towards her in a threatening manner.'"  *Id.*  Tonya Hamlett, then-National Program Manager for

Preventing Violence in the Workplace at EPA, was asked to intervene.  Def.'s Ex. 12 ¶ 3 (Feb. 14,

2006 Declaration of Tonya Hamlett ("Hamlett Decl.")).  She interviewed Dr. Walker and Ms. Reed

and recommended that they be sent home for the remainder of the work week.  *Id.* ¶ 4.  According

to Charles H. Ris, Deputy Director for the NCEA-W and Dr. Walker's second-line supervisor, the

purpose of the administrative leave, "in accordance with advice from the labor relations specialist

[Tonya Hamlett], was to separate the parties and allow for a cooling off period. . . .  [N]either [Mr.

Ris] nor anyone else had reached any conclusions as to what exactly had happened or who was to

blame.  What was apparent was that [there were] two agitated and emotional employees who needed

to be separated from each other, in order to prevent a further escalation of the incident."  Def.'s Ex. 14, Declaration of Charles H. Ris ("Ris Decl.") at 1-2.[3]

Indeed, the argument between Dr. Walker and Ms. Reed was no small matter:

> [Dr. Walker] did not disguise his contempt for Ms. Reed's allegations, which he regarded as baseless. [He] was also very agitated over defamatory remarks that he alleged Ms. Reed made to him during their verbal altercation, which . . . Ms. Reed did not deny uttering.  He was particularly upset that Ms. Reed had publicly maligned him, since the altercation had occurred in cubicled space and apparently at a sufficient volume to have been overheard by nearby co-workers.  He was surprised, and then exercised, over [Mr. Ris's] order for him to leave the building on administrative leave.

*Id.* at 2.  On the next Monday Mr. Ris instructed Dr. Walker and Ms. Reed to have nothing more to do with each other and that responsibilities for mentoring Ms. Reed would be turned over to someone else.  *Id.*  He issued a formal memo, "Subject: The Rules," to each of them stating, *inter alia*, that "[w]hatever did happen is unfortunate for <u>both</u> of you, but it can stop right here."  Def.'s Ex. 15.  After investigating the incident, Ms. Hamlett "concluded that there was insufficient evidence to sustain a finding that anyone had acted violently" and recommended to Dr. Walker's supervisors that the matter be closed.  Hamlett Decl. ¶ 5.

Notwithstanding Mr. Ris's advice and Ms. Hamlett's conclusion, Dr. Walker repeatedly urged management to investigate further his claim that Ms. Reed defamed him and his other allegations against her.  Def.'s Ex. 14.  Other employees were invited to come forward to provide more information, but "there were no witnesses who saw the episode and no one who would

---

[3]   In support of his claim, Dr. Walker argues that the decision to send him home on administrative leave was discriminatory because, on a previous occasion, two White male employees had a heated and loud altercation but neither was forced on leave or made the object of a "violence in the workplace" file.  Compl. ¶ 9, Pl.'s Mem. p. 10.  Dr. Walker, however, offers no competent evidence to support this factual assertion.

admit to overhearing it.  The facts surrounding the altercation were a 'he said/she said' matter."
Def.'s Ex. 14.  Dr. Walker contacted Ms. Hamlett to inquire as to the status of his "case" and,
"because of his degree of agitation over the matter, . . . in a break with [her] usual protocol [she]
issued him a memorandum noting that the case had been closed without any definitive findings."
Def.'s Ex. 12.  On September 2, 1998, Mr. Ris sent Dr. Walker a memo advising that Dr. Walker
should "wrestle with or perhaps let erode away [any embarrassment] as these things will do."  Def.'s
Ex. 20.  He also directed: "The alleged event is a thing of the past in this office, it[']s over!  Let it
go if you can do so.  What you do outside of EPA with the University controversies is none of our
business, though if someone drags EPA into it or if it is perceived that EPA is involved, we might
have to reply."  *Id.*  One week later, on September 9, 1998, Ms. Hamlett "entreated [Dr. Walker] to
discontinue his pursuit of the matter . . . .  What is more, [she] told [Dr.] Walker to refrain from
conduct which might imply that he was acting on behalf of EPA in a matter he had no authority to
look into.  [Dr.] Walker said he understood [her] instructions."  Def.'s Ex. 21 pp. 1-2.

   Despite management's repeated instructions to move on, Dr. Walker could not let the
matter go.  In October 1998 he wrote a letter to the President of the University of Maryland, on EPA
letterhead, suggesting that there was "strong evidence" that Ms. Reed had made false statements on
her application to EPA and had improperly attempted to influence Dr. Walker, "'a government
official.'"  Def.'s Ex. 16.  The letter directed the University to provide Dr. Walker with certain
information "within thirty working days," including proof that Ms. Reed had written certain articles,
a copy of the University's code of ethics for students participating in internship programs, and a
statement from Ms. Reed confirming or denying that she had been convicted of a felony.  *Id.*  Dr.

Walker ended the letter by threatening to turn the matter over the EPA's Inspector General's Office if his demands were not met.  *Id.*

This did not go over well with the EPA, which found the episode "quite embarrassing to EPA, generally, and to [ORD] specifically, and the Director of the NCEA-W apologized for, and repudiated, [Dr. Walker's letter] almost immediately."  Ris Decl. at 3.  On December 3, 1998, EPA issued a formal Letter of Reprimand to Dr. Walker for "refusing to comply with instructions, misrepresenting [his] status as an official representative of the Agency conducting official business, and for misuse of Agency letterhead for unauthorized business."  Def.'s Ex. 22.[4]  Two weeks later, on December 18, 1998, Dr. Walker filed an EEO charge based on the earlier incident with Ms. Reed.  Def.'s Ex. 13.  And, on February 9, 1999, Dr. Walker filed an EEO complaint alleging that the Letter of Reprimand was issued in retaliation for his prior EEO activity.  Def.'s Facts ¶ 21; Pl.'s Ex. 8.

The Letter of Reprimand was to remain in Dr. Walker's personnel file "for a period not to exceed two years."  Def.'s Ex. 22; Pl.'s Facts ¶ 52.  In June 2000, 18 months after the Letter of Reprimand was issued, Dr. Walker asked Mr. Ris why the Letter of Reprimand had not been removed because "the issuing managers had told [Dr. Walker] that it would be taken out before the recommended two year period had ended."  Pl.'s Facts ¶ 54.  According to Dr. Walker, Mr. Ris

---

[4]  Dr. Walker disputes that he was given "instruction on communicating with university officials" and contends that there was "no policy in place requiring management's clearance of such letters."  Pl.'s Response to Def.'s Statement of Material Facts ("Pl.'s Fact Response") ¶ 18.  Despite Dr. Walker's assertions, the record is quite clear that his superiors repeatedly told him not to involve EPA in any further actions regarding his dispute with Ms. Reed.  *See, e.g.*, Def.'s Exs. 20-21.  Dr. Walker also contends that he sent the letter to the University "after [he] had obtained advice from Richard Drummond, an attorney from EPA's Office of General Counsel," *id.* ¶ 44, but Mr. Drummond told the EEO counselor that he did not see the letter before Dr. Walker sent it to the University; if he had seen the letter he would have told Dr. Walker to make "substantial revisions"; and, if Dr. Walker refused to make the revisions, he would have brought the matter to management's attention, Pl.'s Ex. 6 at 13-14.

responded, "I do not know.  You are still filing all of those EEO complaints."  Pl.'s Facts ¶ 55.

Defendant denies that anyone at EPA told Dr. Walker that the letter would be removed before the

two-year period ended and that Mr. Ris stated that the letter was being kept in the file because Dr.

Walker filed EEO complaints.  *See* Def.'s Reply Brief at 14-15.  In any event, due to an

administrative error, it appears that the Letter of Reprimand had never actually been placed in Dr.

Walker's personnel file.  Def.'s Ex. 10 (Hamlett Decl.)¶¶ 8-10.[5]

On or about December 21, 2000, Dr. Walker filed a class complaint against the EPA

alleging discrimination based on race, gender, and retaliation.  Pl.'s Facts ¶ 59.  Thereafter, in August

2001, Dr. Walker learned that Mr. Ris had told Agency counsel from the EPA Office of the General

Counsel about the December 3, 1998, Letter of Reprimand and had sent counsel a copy, even though

it should have been removed from Dr. Walker's personnel file earlier.  *Id.* ¶¶ 60-62.  Dr. Walker

contends that Mr. Ris's communication with Agency counsel violated the promise that the Letter of

Reprimand would not be used as the basis for an adverse personnel action after the two-year period

had expired.  *Id.* ¶¶ 62-63.

As another part of the alleged pattern of retaliation, Dr. Walker complains about an

incident in June 2004.  At that time, the Office of Research and Development published a list of

individuals who received cash awards in a competition judging scientific research papers.  Pl.'s Facts

¶ 29.  Dr. Walker had submitted a paper for the competition but was not recognized.  *Id.* ¶ 30.  He

"was a bit suspicious, because the list primarily contained names of individuals who were either

---

[5] Dr. Walker disputes that the Letter of Reprimand was never in his personnel file and cites to the fact that the EPA produced the Letter in response to his discovery requests in this action.  *See* Pl.'s Fact Response ¶ 20.  The fact that Defendant produced the Letter is not evidence that it was actually in Dr. Walker's official personnel file and does not contradict Ms. Hamlett's sworn statement that, when she looked in Dr. Walker's personnel file, the Letter was not there.

program directors/managers or persons who controlled the research 'purse strings' in NCEA/ORD, or personal friends of those individuals." *Id.*  Because this appeared to be a conflict of interest to Dr. Walker, he "sent a 'global' email to NCEA, ORD managers, and scientists, expressing his concerns and asking management to look into this matter by asking the Office of the Inspector General to provide a reading on whether his concerns were justified." *Id.* ¶ 32.  On June 25, 2004, Mr. Ris sent an email to Dr. Walker admonishing him for sending the global email because "[t]hese types of matters . . . are kept reasonably confidential in initial stages so that proper inquiry can be made and so that the named employees are not unfairly branded, embarrassed by allegations . . . or suffer unnecessary defamation of character." Def.'s Ex. 24.  Dr. Walker challenges this admonishment as retaliation for his participation in prior EEO activity and as discrimination because of his race, although it is undisputed that he failed to seek EEO counseling on this matter until May 3, 2005. Def.'s Facts ¶ 32.

Summing up his claims, Dr. Walker alleges a pervasive retaliatory policy against him "in [an] attempt to put him in his place and violate his civil rights," including:

- taking away his supervisory responsibilities over summer interns;

- eliminating the summer intern program for minorities;

- taking away his ability to use EPA letterhead to communicate with individuals outside the Agency about EPA-related matters;

- preventing him from participating in functions or activities within the Agency that would allow him to advance or be promoted to a GS 15 or above;

- preventing him from participating in functions or activities within the Agency that are commensurate with his skill, background and expertise (scientific workgroups, priority projects, etc.);

- preventing him from using the office email system to communicate with others within NCEA/ORD on issues related to the Agency;

- preventing him from being selected to a higher grade level that he was the most qualified for;

- using the Letter of Reprimand to prevent him from being certified as a class agent; and

- preventing him from contacting EPA's Office of Inspector General on matters related to misuse of government funds and other related issues.

Compl. ¶ 16. Dr. Walker prays for $1,000,000 in damages, a promotion to a GS-15/10 position, with full backpay from 1998, an injunction, and costs and attorneys' fees.

## II. LEGAL STANDARDS

Defendant moves to dismiss for failure to state a claim or, in the alternative, for summary judgment. A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face, testing whether a plaintiff has properly stated a claim. Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (internal citations omitted). The court must treat the complaint's factual allegations — including mixed questions of law and fact — as true, drawing all reasonable inferences in the plaintiff's favor, *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003), and the facts alleged "must be enough to raise a right to relief above the speculative level," *Twombly*, 127 S. Ct. at 1965. But the court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In deciding a 12(b)(6) motion, the Court may consider

only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citation omitted). The Court may, however, in its discretion, consider matters outside the pleadings and thereby convert a Rule 12(b)(6) motion into a motion for summary judgment under Rule 56. *See* Fed. R. Civ. P. 12(b); *Yates v. District of Columbia*, 324 F.3d 724, 725 (D.C. Cir. 2003).

Under Federal Rule of Civil Procedure 56, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). Summary judgment is properly granted against a party that "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson*, 477 U.S. at 248. A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "[t]he mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. Moreover, the nonmoving

party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene*, 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

### III.  ANALYSIS

Dr. Walker has been waiting a long time to get his case to court and he deserves the Court's full attention. Each of his claims will be examined in turn.

### A.      **Non-selection for the OCHP Vacancy**.

Dr. Walker's first claim is based on his non-selection for a position at OCHP. He argues that the decision to choose another candidate for the position was the result of racial discrimination and retaliation based on his prior EEO activity. To prove unlawful discrimination in violation of Title VII, Dr. Walker must produce evidence that (1) he is a member of a protected class, (2) he suffered adverse employment action, and (3) the adverse employment action gives rise to an inference of discrimination. *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007). Dr. Walker has satisfied his burden on these factors: he is an African-American male, he was at least minimally qualified for the position, he was not appointed to the position, and the job was awarded to Ms. Goode, a White female. *See, e.g.*, *Harris v. Chao*, 480 F. Supp. 2d 104, 108-09 (D.D.C. 2007) (citing *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)). Thus, a burden of production shifts to Defendant to demonstrate a legitimate, nondiscriminatory reason for the EPA's promotion decision. *See Broderick v. Donaldson*, 437 F.3d 1226, 1231-32 (D.C. Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If Defendant makes this showing

the burden shifts back to Dr. Walker to prove that the alleged nondiscriminatory reason is a pretext

for unlawful discrimination. *See Broderick*, 437 F.3d at 1232. The ultimate burden of proof never

leaves the Title VII plaintiff. *See id.*

   The EPA's basic position is that, while Dr. Walker was minimally qualified for the

position, he was not the most qualified candidate and, therefore, it legitimately selected Ms. Goode,

the most qualified person for the job. That explanation is amply supported by the facts: Ms. Kelly

ranked the candidates numerically based on the selection criteria in the vacancy announcement,

transmitted those rankings to Ms. Trovato, the selecting official, and Ms. Trovato chose the highest-

ranked candidate. Thus, the EPA has provided evidence of a legitimate, nondiscriminatory reason

for passing over Dr. Walker — *i.e.*, that it hired the most qualified candidate. *See, e.g.*, *Pyne v.

District of Columbia*, 468 F. Supp. 2d 14, 20-21 (D.D.C. 2006) (holding that promoting a more

qualified candidate over the plaintiff was a legitimate, nondiscriminatory reason that shifted the

burden back to the plaintiff to show pretext); *see also Gipson v. Wells Fargo N.A.*, 460 F. Supp. 2d

15, 25 (D.D.C. 2006) (same).

   Dr. Walker offers several arguments in an attempt to show that the EPA's hiring

decision was actually motivated by race and gender discrimination. First, Dr. Walker argues that the

Subject Matter Expert reviewed the applications and then dropped "health physics" from the

selection criteria for the discriminatory purpose of depriving him of the top spot on the certified list.

Compl. ¶ 15. There is no evidence to support this allegation. It is undisputed that Ms. Kelly, the

Subject Matter Expert, deleted "health physics" as a criterion before she received any applications

— Dr. Walker does not dispute that she told the EEO counselor as much, *see* Pl.'s Facts ¶ 28, and

he offers no contrary evidence. Moreover, despite the fact that the health physics criterion was

removed, Dr. Walker received nine out of a possible 12 points for that selection factor — the same score received by Ms. Goode, the person who was ultimately selected for the position.  Def.'s Ex. 6.  And even if the health physics criterion were not removed and Dr. Walker had received the highest possible score for that selection factor, his total score would have been only 34, well short of the total scores attained by the three highest-ranked candidates.  Thus, Dr. Walker's argument that the health physics criterion was removed in order "to prevent [him] from being the most highly ranked candidate," Compl. ¶ 15, is contradicted by the undisputed evidence.

Dr. Walker further contends that Ms. Kelly's assertion that she had no knowledge of the applicants' races at the time she rated them is not credible because the applicants' races could easily be inferred from various items on their resumes.  Pl.'s Mem. at 13-14.  Even if one assumes that Ms. Kelly knew that Paula Goode is a White female, Robin Anderson is an African-American female, Denny Cruz is an Hispanic male, and Dr. Walker is an African-American male, that does not support an inference of race or gender discrimination against Dr. Walker since the top-three candidates included an African-American female and an Hispanic male.  In light of this undisputed fact, Ms. Kelly's assumed knowledge of the applicants' races does not support an inference that Dr. Walker was passed over because he is an African-American male.

Dr. Walker also asserts that "there is strong evidence in the record to indicate that the position was 'wired' [created specifically for Paula Goode]."  Pl.'s Fact Response ¶ 4.  But Dr. Walker never specifies what that evidence is, and the Court finds no such evidence anywhere in the record.  Dr. Walker also argues that Ms. Kelly did not evaluate the applicants on the same criteria, but he has nothing beyond his own argument to support this claim.  *See* Pl.'s Facts ¶ 19.  This is

legally insufficient — a plaintiff must come forward with evidence, not mere argument, in order to avoid summary judgment. *See, e.g.*, *Celotex*, 477 U.S. at 322-23.

Dr. Walker further argues that there is evidence of discrimination because Ms. Kelly improperly certified Ms. Goode as "highly qualified" for a GS-14 position when Ms. Goode did not meet the minimum requirements to become a GS-14 because she had served only six months as a GS-13. Pl.'s Mem. at 15. This argument ignores that fact that the vacancy was advertised as a GS-13/14, which meant that anyone with at least a year at a GS-12 level had enough time in grade to fill the position as a GS-13; applicants with at least a year at a GS-13 level had sufficient time in grade to fill the position as a GS-14. Ms. Goode was a GS-13 with six months at that grade and was ranked first due to her rating of 47 by Ms. Kelly. Because she was already a GS-13, Ms. Kelly put her on the GS-14 certified list along with Mr. Cruz; Ms. Anderson was certified on a GS-13 list. While Ms. Kelly erred by including Ms. Goode on the list of candidates who were certified for a GS-14 vacancy, the vacancy announcement allowed the selected candidate to receive *either* a GS-13 *or* GS-14 grade depending on his/her existing status. There is no evidence that Ms. Goode received a GS-14 grade prior to her completion of a full year as a GS-13, and certainly her six months as a GS-13 did not disqualify her from filling the position. Nothing in this fact sequence suggests that Ms. Kelly's ranking of Ms. Goode as qualified for a GS-14 grade was in any way influenced by Dr. Walker's race or color or gender.

Finally, Dr. Walker argues that his credentials far exceeded those of Ms. Goode so that discrimination is the only explanation for his non-selection. *See* Pl.'s Mem. at 15. Clearly, Dr. Walker's educational qualifications were superior to the other candidates: he holds a B.S. and M.S. in Physics and a Ph.D. in Radiation Biophysics, and he had worked as a senior environmental

scientist with the EPA for 13 years.  Ms. Goode had no degree and had taken 30 credit hours of science courses; Mr. Cruz had a B.S. degree in chemical engineering with no experience in the health area; and Ms. Anderson, who was placed on the GS-13 certification, had a B.S. and M.S. in electrical engineering but no experience in the health field.  These differences in backgrounds and experience have been fully explained by Ms. Kelly, who compared Dr. Walker's scientific bent and contract administration experience with the outreach functions of the posted position and the credentials of the other candidates in those areas.  When she re-reviewed Dr. Walker's application, Ms. Kelly explained that his extensive scientific background was, for the vacant position, more of a detriment than an asset.  Def.'s Ex. 8.  Dr. Walker offers nothing beyond his own argument to refute this evidence, and it is not for this Court to second-guess the EPA's ostensibly legitimate personnel decision.  *See Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) ("Title VII, it bears repeating, does not authorize a federal court to become a super-personnel department that reexamines an entity's business decisions.") (internal quotation marks omitted).  Because Dr. Walker fails to offer evidence that the EPA's nondiscriminatory reason for not selecting him was a pretext, Defendant is entitled to summary judgment on Dr. Walker's claim that he was not promoted in 1997 due to his race, color,[6] or gender.

In addition to claiming discrimination, Dr. Walker argues that his non-selection was the result of retaliatory animus.  To establish a prima facie case of retaliation in violation of Title VII, Dr. Walker must prove that (1) he engaged in protected activity, (2) his employer took a materially adverse action against him, and (3) there is a causal relationship between the two.

---

[6] Dr. Walker offers no distinct argument or evidence that his color (brown) was the basis for the alleged discrimination against him.

*Holcomb*, 433 F.3d at 901-02.  The facts do not establish a prima facie case.  The only prior EEO

activity cited by Dr. Walker was a discrimination charge that he filed against his former supervisor

in 1994, which was settled in 1995 with the approval of Ms. Trovato.  *See* Pl.'s Facts ¶¶ 1-7.  This

is far too remote to create any presumption of retaliation.  *See Clark County Sch. Dist. v. Breeden*,

532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's

knowledge of protected activity and an adverse employment action as sufficient evidence of causality

to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'").

Dr. Walker has provided no other evidence to suggest that the EPA's promotion decision in 1997

was motivated by retaliation for EEO activity that occurred several years before.  Accordingly, even

assuming Dr. Walker could establish the first two elements of his prima facie case, the record

contains no evidence of causation and, therefore, Dr. Walker's retaliation claim fails as a matter of

law.

**B.     Specific Instances of Alleged Discrimination and Retaliation**.

Dr. Walker challenges a number of specific incidents as constituting a pattern of race

and gender discrimination as well as retaliation for his EEO activity.

*1.     The Incident with Ms. Reed*.

There is no doubt that Dr. Walker felt deeply insulted by Ms. Reed's angry

accusation, presumably overheard by colleagues, that he had raped her.  There was clearly no basis

for such a slur.  Dr. Walker was also deeply offended by Ms. Reed's suggestion that she and her

professor should be mentioned in someone else's grant application.  The second of these twin

offenses led to the argument which provoked the first.  The legal question is whether Dr. Walker has

an actionable claim that the ten-hour administrative leave he was directed to take constituted

discrimination or was a retaliatory action for his prior EEO activity, *i.e.*, his complaint concerning the EPA's failure to select him for the OCHP position.

With respect to his contention that the EPA placed him on administrative leave based on his race and/or gender, Dr. Walker must prove that (1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) the adverse employment action gives rise to an inference of discrimination. *Czekalski*, 475 F.3d at 364. Dr. Walker, as an African-American, has clearly established the first element of a prima facie case. As to the second element, however, the evidence is lacking. In order to constitute an adverse employment action for purposes of a Title VII discrimination claim, the action must cause "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). Placing Dr. Walker on administrative leave for ten hours was not an adverse employment action under this standard. Both he and Ms. Reed received the same instruction not to return to work, Dr. Walker was paid for the time he spent on administrative leave, no other employment action was taken against him, and the investigation concluded that he had engaged in no wrongdoing. This fact pattern fails to satisfy the requirements of an adverse action. *See, e.g.*, *Childers v. Slater*, 44 F. Supp. 2d 8, 20 (D.D.C. 1999) ("A reprimand that amounts to a mere scolding, without any disciplinary action which follows, does not rise to the level of adverse action.").

Even if forced administrative leave could be considered an adverse employment action, there is no evidence in the record to support an inference of discrimination. It is beyond dispute that the decision to send Dr. Walker (and Ms. Reed) home for the remainder of the week was

motivated by a desire to separate him and Ms. Reed in order to avoid any further escalation of their row.[7]  Dr. Walker vaguely alludes to another incident in which two White employees were involved in a physical altercation but were not sent home by management, *see* Compl. ¶ 9, Pl.'s Mem. at 10, but he offers no competent evidence to support this contention.  And the fact that a labor relations specialist and the supervisors who interviewed Dr. Walker are White and he is Black provides no basis for a discrimination claim: those individuals held the relevant management positions to investigate the incident between Dr. Walker and Ms. Reed and to take action if required.  Except for alleging that a panel of White people interviewed him "because" he is an African-American, Compl. ¶ 9, Dr. Walker offers no support for the allegation that this arrangement was discriminatory and not normal office procedures.  There is simply no evidence to support a Title VII discrimination claim based on the incident with Ms. Reed.

To establish a prima facie case of retaliation in violation of Title VII, Dr. Walker must prove that (1) he engaged in protected activity, (2) his employer took a materially adverse action against him, and (3) a causal relationship between the two.  *Holcomb v*, 433 F.3d at 901-02.  The second element is similar to but slightly different from the "adverse employment action" requirement for a discrimination claim, as the Supreme Court has recently explained:

---

[7]  Dr. Walker seems to suggest that there was no reason to send him home because "[t]here was <u>no</u> evidence introduced into the record to show that there was an altercation between [Dr. Walker] and [Ms. Reed]."  Pl.'s Fact Response ¶ 16.  However Dr. Walker wishes to characterize the incident, it is beyond legitimate dispute that there was an argument between Dr. Walker and Ms. Reed, that during the argument Ms. Reed accused Dr. Walker of raping her, that Ms. Reed initially told management that Dr. Walker had "turned towards her in a threatening manner," and that management found the incident sufficiently serious to ask an EPA labor relations specialist to assess the situation.  That Dr. Walker disputes that this event rose to the level of an "altercation" does not create a genuine issue of material fact.

> The anti-retaliation provision [in Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm. . . . [A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it might well have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"
>
> We speak of *material* adversity because we believe it is important to separate significant from trivial harms. . . . An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. . . .
>
> We refer to reactions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective. An objective standard is judicially administrable. . . .
>
> We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters.

*Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2415 (2006) (citations omitted).

> *Burlington Northern* guides the Court's analysis here. To become a legal claim, retaliation must "produce[ ] an injury or harm." *Id.* Dr. Walker identifies no harm to him from the ten-hour period of administrative leave and none is indicated by the record. Dr. Walker was fully compensated for the time away from work; the leave had no impact and made no change to his job, his duties, his compensation, or any other identified tangible aspect of his life. As a result of the incident, Ms. Reed's office was moved away from Dr. Walker's but that change did not occur because of the administrative leave. To be sure, Dr. Walker was "exercised" by Mr. Ris's direction to him to leave the building on Thursday afternoon and to stay away until Monday, as if Dr. Walker himself had possibly misbehaved in the encounter with Ms. Reed. At that point, however, all Mr. Ris knew was that Ms. Reed had said that Dr. Walker acted in a threatening manner — allegations

that were never proved and that themselves had no impact on Dr. Walker's position within EPA. At least on these facts, there was no material injury or harm in being directed to take a paid day off.

Equally, the Court cannot find that a reasonable employee would have been dissuaded from making or supporting a charge of discrimination because of the ten-hour period of administrative leave. Dr. Walker thought that only he was sent out of the office for a cooling-off period, but the record demonstrates that Ms. Reed was similarly treated. *See* Def.'s Ex. 14. Both of them received Mr. Ris's memo on "The Rules," and each was instructed to have nothing to do with the other. Perhaps, feeling himself the injured party by Ms. Reed's accusation, Dr. Walker was in no mood for group questioning. But Dr. Walker's subjective reaction to an objectively reasonable process does not support his allegation that the process was retaliatory because of his prior EEO charge. The "petty slights or minor annoyances that often take place at work and that all employees experience" are insufficient to support a retaliation claim under Title VII. *Burlington Northern*, 126 S. Ct. at 2415.

Finally, Dr. Walker alleges that EPA refused to investigate or consider his concerns that Ms. Reed had violated federal law, made false allegations about him, and defamed his name. The record indicates that this allegation is not entirely accurate: employees who might have overheard the exchange were asked to come forward and provide information. Def.'s Ex. 14. None did. *Id.* Finding itself in a "he said/she said" cul-de-sac, the EPA ended its investigation without making any findings or reaching any conclusions. Further, Ms. Reed was an unpaid summer intern who ended her internship about two weeks after her encounter with Dr. Walker; the EPA had no authority or control over her. Again, Dr. Walker has shown no material, objective harm or injury caused by the failure and/or inability of EPA to investigate his concerns more fully.

Having carefully considered Dr. Walker's claim that his ten-hour period of administrative leave and other aspects of EPA's handling of the Reed incident were illegally biased by retaliatory animus, the Court must disagree. There is no evidence of a material adversity visited upon Dr. Walker, nor is there evidence that these actions or inactions would cause a reasonable employee to cease to participate in protected activity.

2.     *Letter of Reprimand*

Dr. Walker wrote to the President of the University of Maryland to inform him of "strong evidence" that Ms. Reed had been arrested and convicted of a felony, contrary to statements on her EPA application; that she presented "unsubstantiated" information concerning her academic credentials on her resume; and, "[o]f serious concern," that she attempted to influence Dr. Walker, "a government official," to include the same unsubstantiated information in a grants proposal. Def.'s Ex. 16. Dr. Walker intimated that Dr. Tony Whitehead of the University may have played a role in Ms. Reed's allegedly improper conduct. *Id.* Finally, he stated that he would forward the matter to the EPA Inspector General if the University did not provide detailed information about Ms. Reed within 30 days. *Id.* The EPA was quite embarrassed by Dr. Walker's letter when it heard about it from the University and it therefore issued the Letter of Reprimand to Dr. Walker. Def.'s Ex. 22. According to Dr. Walker, the Letter of Reprimand was motivated by retaliatory animus.

In response to his allegation that the Letter of Reprimand violated Dr. Walker's rights under Title VII, the EPA argues that the Letter of Reprimand did not constitute "actionable adverse actions under Title VII." Def.'s Mem. at 7. This, however, is no longer the standard for retaliation

claims.[8]  Under *Burlington Northern*, the Court finds that a formal letter of reprimand could be sufficient to dissuade an objectively reasonable employee from participating in EEO activities. Because it was to remain in Dr. Walker's official personnel file for two years, adding a level of severity to any future discipline that might occur in that time frame, it cannot be said that such a reprimand would be immaterial.

Nevertheless, Dr. Walker cannot establish a prima facie case of retaliation because there is a clear absence of any causal connection between his prior EEO activity and the Letter of Reprimand.  Dr. Walker filed a formal charge of discrimination, based on his non-selection for the OCHP position, on July 14, 1998; he wrote the letter to the President of the University of Maryland on October 29, 1998; presumably, the University contacted the EPA about Dr. Walker's letter early in November 1998; and the Letter of Reprimand was issued on December 3, 1998.  Although a close temporal nexus between a materially adverse act and prior protected EEO activity can give rise to an inference of causation, the time lapse here is too great to support such an inference.  When causation is based on "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action[,] . . . the temporal proximity must be very close." *Breeden*, 532 U.S. at 273 (internal quotation marks omitted).  This Court has held that a span of three months between the employee's EEO activity and the employer's adverse action may be too long to support a presumption of causation.  *See Sullivan-Obst v. Powell*, 300 F. Supp. 2d 85, 94 (D.D.C. 2004).  Because approximately five months had elapsed between Dr. Walker's EEO charge and the Letter of Reprimand, the EEO charge was too remote to establish the final element of Dr. Walker's

---

[8]  Dr. Walker does not argue that the Letter of Reprimand was the result of racial discrimination.  *See* Pl.'s Mem. at 11-12 (exclusively arguing that the Letter of Reprimand was in retaliation for his prior EEO activity)

prima facie case.  And because there is no other evidence that the Letter of Reprimand was caused by Dr. Walker's prior EEO activity, Dr. Walker's prima facie case must fail.

Dr. Walker says that the Letter of Reprimand was issued "[w]ithin days after [he] contact[ed] the EEO counselor" regarding his forced administrative leave following the incident with Ms. Reed, but he points to no evidence that Michael Callahan, Director of NCEA-W and the author of the Letter of Reprimand, or anyone else in the chain of command, knew at the time about his informal contact with an EEO counselor.  *See, e.g.*, *McIntyre v. Peters*, 460 F. Supp. 2d 125, 134 (D.D.C. 2006) ("To support a retaliation claim, a plaintiff must show that the alleged discriminating official's knowledge of prior protected activity preceded the official's contemplating adverse action.").  Dr. Walker did not file his formal EEO charge regarding his forced administrative leave until December 18, 1998, two weeks after the Letter of Reprimand.  Thus, the record indicates that the only relevant prior EEO activity was Dr. Walker's July 1998 charge regarding his non-selection for the OCHP position.  The record simply contains no evidence to support a presumption of causation.

Were there more proof of a causal connection between Dr. Walker's EEO activity and the Letter of Reprimand, the allegation that it was issued to retaliate against him would still lack merit.  Once an employee has made out a prima facie case (here, that Dr. Walker engaged in EEO activity, the Letter of Reprimand might be materially adverse to a reasonable employee, and the Letter issued soon enough after EEO activity to establish a causal connection), the burden shifts to the employer to demonstrate a legitimate, non-retaliatory reason for its action.  *See Broderick*, 437

F.3d at 1231-32.  The EPA's reason for issuing the Letter of Reprimand is clear from the Letter
itself:

> [Dr. Walker's] failure to comply with management's instructions is
> unacceptable behavior and undermines management's authority.  Further,
> [his] failure to comply with Agency policy concerning unauthorized use of
> the Agency letterhead created the false and misleading impression that [his]
> demands of the University of Maryland were part of an official inquiry on
> behalf of EPA. [Dr. Walker's] threat of adverse consequences to be taken
> by EPA for failure to follow [his] unauthorized request is a serious matter
> which compromises the Agency's integrity in dealing with the public.

*See* Def.'s Ex. 22 at 2.  Simply put, the reason that the EPA issued the Letter of Reprimand was that

Dr. Walker engaged in misconduct, fairly serious misconduct in the EPA's view, that violated the

Agency's internal policies and caused it serious public embarrassment.

Dr. Walker insists that his letter was appropriate; that he did not refuse to comply

with instructions; that he did not misrepresent his status as an official representative of EPA because

he "clearly stated in the letter that the inquiry was on his behalf as an EPA employee," Pl.'s Mem.

at 12; that he did not misuse the EPA letterhead because the "letter clearly addressed EPA business,"

*id.*; and that the EPA did not produce any evidence that he violated EPA policy by sending the letter.

These arguments are unavailing.  First, Dr. Walker concedes that he sent the letter "in

his official capacity as an Agency employee," thereby undermining his argument that he did not

misrepresent his status as an official representative of the EPA.  In any event, it is undisputed that

Mr. Ris and Ms. Hamlett clearly and repeatedly instructed Dr. Walker to leave EPA out of any

efforts he might make to pursue his cause against Ms. Reed.  The letter failed to follow that

instruction — nowhere did the letter state that the inquiry was on Dr. Walker's own behalf and its

demanding tone and threat to refer the matter to the Inspector General sounded official.  As an

individual sending such a letter, Dr. Walker would clearly have had no authority to make such demands.  Only by using EPA stationary, and writing as if he truly were an "official" of the Agency and not a non-supervisory employee, could Dr. Walker convey force to his demands and threats.  This action was directly contrary to explicit instructions.  Dr. Walker's contention that the letter did not create the appearance of an official statement by the EPA is without merit.

Indeed, the real rub is that Dr. Walker continues to believe that the letter addressed EPA business, not his personal business with Ms. Reed.  That perspective is what haunts him.  EPA had given him multiple messages that the matter, as far as the Agency was concerned, was over; EPA was not interested in pursuing it further.  That Dr. Walker continued to be angry and so raised his accusations against Ms. Reed with the University did not transform his personal crusade against her into official Agency business.  Sure enough, Dr. Walker interviewed Ms. Reed for an intern position with EPA and that was Agency business.  Sure enough, Dr. Walker and Ms. Reed were discussing a grant application to EPA at the time of their argument and the grant application was Agency business.  Sure enough, EPA's inquiry into the incident and its decision that no blame could be assigned to either party was Agency business.  Sure enough, EPA's directions to Dr. Walker that "it[']s over!" and to leave EPA out of any discussions with the University were Agency business.  From that point forward, however, any action taken by Dr. Walker was *his own personal* business.  While the Court anticipates that Dr. Walker may continue to disagree, the record is utterly clear that EPA wanted no part of his continued dispute with a former intern and that Dr. Walker dragged the Agency right into the middle of it by using official letterhead, threatening a referral to the EPA's Inspector General, and demanding detailed information about Ms. Reed within 30 days.  There can

be no genuine dispute that the EPA had a legitimate, non-retaliatory reason for issuing the Letter of Reprimand.  Defendant is therefore entitled to summary judgment on this claim.

        3.        *Mr. Ris's Transmission of the Letter of Reprimand to Agency Counsel.*

Dr. Walker alleges that the sharing of the Letter of Reprimand by Mr. Ris with in-house Agency counsel for the EPA in August 2001, and counsel's use of the reprimand to counter class certification on a charge of race, gender, and retaliatory discrimination filed by Dr. Walker in December 2000, were in retaliation for his prior EEO activity.  He bases this allegation on the premise that the Letter of Reprimand should have been removed from his file and destroyed two years after it was issued, *i.e.*, no later than December 3, 2000.

Defendant concedes that Mr. Ris provided the Letter of Reprimand to Agency counsel who was defending Mr. Walker's class complaint and that Agency counsel submitted the Letter as an exhibit to a brief opposing class certification.  Def.'s Reply Mem. at 15.  Defendant argues, however, that the Letter of Reprimand was relevant evidence because it was probative of Dr. Walker's fitness to serve a class representative and, therefore, it was entirely proper for Agency counsel to use it.

The Court can find no unlawful retaliation on these facts.  It was not improper for the EPA to maintain the Letter of Reprimand in its files beyond the two-year period that it was to remain Dr. Walker's official personnel file.  In fact, because Dr. Walker was pursuing an EEO charge involving the Letter the Reprimand, it would have been improper for the EPA *not* to maintain the Letter in its files.  Moreover, there is nothing in the record from which the Court could conclude that using the Letter in opposition to Dr. Walker's class claim breached the promise that the Letter would not be used to support an employment action beyond the two-year period.  The brief filed by Agency

counsel is not in the record, and the EPA's contention that the Letter was relevant to Dr. Walker's ability to serve as a class representative is at least plausible.  On these facts, the Court cannot conclude that the transmission of the Letter to Agency counsel or counsel's use of the Letter were adverse actions within the meaning of *Burlington Northern* and Title VII.  Defendant is therefore entitled to summary judgment on this aspect of Dr. Walker's claim.

4.      *Admonishment for Global Email.*

Dr. Walker admittedly sent a "global" email to all managers and scientists in ORD suggesting that management should ask the Inspector General investigate the cash awards in 2004 because Dr. Walker was "a bit suspicious" that the awards were discriminatory and resulted from an apparent conflict of interest.  Pl.'s Facts ¶¶ 30-32.  It is also undisputed that on June 16, 2004, at the alleged direction of Drs. Preuss and Alapas, Mr. Ris sent an email to Dr. Walker stating:

> Use of EPA email as a means of public distribution for this type of topic and circumstance is not condoned.  Agency employees are expected to maintain levels of behavior which conform to the highest ethical standards. Your public posting (NCEA - ALL ORD-ADA-ALL) was poor judgement [sic], unprofessional, and is unacceptable conduct in this Division.  I trust this is perfectly clear, if it is not you should seek immediate clarification for your benefit.

Def.'s Ex. 24 at 2.  Dr. Walker inquired of Ray Spears, Deputy Chief of Staff for the EPA Administrator, to determine if his email violated any EPA policy.  *Id.*  He received the following response from Rafael Deleon's Office almost a year later, on March 22, 2005: "We contacted CEI's Information Technology Policy and Planning Division.  Basically, there is no policy that specifically addresses the proper use of e-mails."  *Id.*  Dr. Walker then filed an EEO charge alleging that the admonishment from Mr. Ris was issued "because of my race and retaliation."  *Id.*

Two problems of timeliness bar consideration of this claim.  First is the fact that the

EEO complaint, filed on June 15, 2005, was untimely as to the June 26, 2004, email from Mr. Ris.

The Federal regulations implementing Title VII require an aggrieved federal employee to contact an

EEO counselor within 45 days of an adverse action.  *E.g.*, *Broderick*, 437 F.3d at 1232 ("To

challenge an adverse action, an employee of a federal agency must 'initiate contact with [an EEO]

Counselor within 45 days of the date of the matter alleged to be discriminatory . . . .'") (quoting 29

C.F.R. § 1614.105(a)(1)).  The failure to file a timely EEO complaint provides the agency with an

affirmative defense to an employee's subsequent lawsuit under Title VII.  *See, e.g.*, *Aceto v. England*,

328 F. Supp. 2d 1, 5 (D.D.C. 2004) (granting the Navy's motion for summary judgment because

federal employee failed to file EEO charge within 45 days of alleged adverse actions).

      Dr. Walker concedes that he filed the EEO charge relating to Ms. Ris's email almost

a year after the fact, but he argues that the 45-day requirement should have been extended because

"just after the admonishment e-mail was sent . . . he immediately started to investigate the matter by

contacting [Mr. Spears] to determine if he violated any EPA policies by sending the 'global' email."

Pl.'s Mem. at 18.  Because the EPA did not promptly reply to this inquiry, Dr. Walker argues that

he deserved an extension of time to file an EEO charge.  The Court cannot agree.  Obviously Dr.

Walker felt himself aggrieved by Dr. Ris's email; but the fact that he decided to investigate his claim

on his own without first contacting an EEO counselor is not a legitimate reason to extend the 45-day

deadline.  There is no question of Dr. Walker's familiarity with the EEO process and no Agency

employee misguided him on timely filing.  Thus, the facts do not excuse Dr. Walker's failure to

comply with 29 C.F.R. § 1614.105.

      The second timeliness issue lies in connecting Mr. Ris's June 2004 email to prior

EEO activity by Dr. Walker.  As discussed above, prior EEO activity can create a presumption of

causation only if it is in "very close" temporal proximity to the adverse action. *Breeden*, 532 U.S. at 273. The record reveals that Dr. Walker's most recent predicate EEO complaint was filed in 2001, more than three years before Dr. Ris's email. This is far too remote to support a finding of causation. *E.g.*, *Sullivan-Obst*, 300 F. Supp. 2d at 94 (three months too remote to support causation).

Even putting the timeliness issues aside, Dr. Walker cannot base a discrimination or retaliation claim on Mr. Ris's email because it was not an adverse action or materially adverse act. The email had no tangible effect on the terms or conditions of Dr. Walker's employment, and no reasonable employee would have been dissuaded from filing an EEO charge based on the email, which — even in the light most favorable to Dr. Walker — amounts to nothing more than a mild rebuke and an instruction not to repeat the offending conduct. It exemplifies the type of "mere scolding, without any disciplinary action which follows" that is simply not actionable under Title VII. *Childers*, 44 F. Supp. 2d at 20.

**C.**     **Pervasive Retaliatory Policy**.

Finally, Dr. Walker lists all the bad things that he perceives to have happened to him at EPA as demonstrative of a "pervasive retaliatory policy." Compl. ¶ 16. It is necessary to work through each of these allegations to determine if they are properly before the Court, allege objective harm or injury, or are not rebutted by a legitimate reason proffered by EPA and not demonstrated to be pretext by Dr. Walker.

*1.*     *Taking away his supervisory responsibilities over summer interns* [Compl. ¶ 16a].

Dr. Walker alleges that EPA took away his supervisory responsibilities over summer interns; the Agency responds that it separated Dr. Walker and Ms. Reed for the short remainder of

her summer internship and then cancelled the program altogether.  It also notes that Dr. Walker does not hold a "supervisory" position.

 While Dr. Walker may not be a supervisor to other EPA employees, it is difficult to find that he had no supervisory/mentorship relationship with Ms. Reed.  The line between mentoring and supervising a summer intern is too thin to cut.  However, the EPA has presented a legitimate, nondiscriminatory reason for separating Ms. Reed and Dr. Walker after their verbal exchange.  Moreover, nowhere in his EEO charges did Dr. Walker raise this as one of the retaliatory actions taken against him.  *See* Def.'s Exs. 11 & 13.  It is well established that an employee who seeks to challenge an adverse action under Title VII must raise that action during the administrative claims process.  *See Nat'l Passenger R.R. Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they relate to acts alleged in timely filed charges.").  "A court cannot allow liberal interpretation of an administrative charge to permit a litigant to bypass the Title VII administrative process."  *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995).  Dr. Walker's allegation that he was relieved of any supervisory responsibilities in the summer internship program was never presented to the EPA for investigation and, therefore, Dr. Walker is barred from raising it for the first time in this lawsuit.

 2. *Eliminating the summer intern program for minorities* [Compl. ¶ 16b].

 Dr. Walker contends that the EPA discriminated and retaliated against him when, after the incident with Ms. Reed, it eliminated the summer intern program for minority students.  Again, Dr. Walker never raised this issue in his EEO charges.  *See* Def.'s Exs. 11 & 13.  He is therefore barred from raising it now.  *See Morgan*, 536 U.S. at 113 .

-32-

3.     *Taking away his ability to use EPA letterhead to communicate with
individuals outside the Agency about EPA-related matters* [Compl. ¶ 16c].

Dr. Walker alleges that the EPA deprived him of the ability to use EPA letterhead to

send correspondence outside the Agency.  But the Letter of Reprimand said only that Dr. Walker was

prohibited from using EPA letterhead for conducting personal business; it put no limitation on his

ability to use letterhead for Agency business.  As explained above, the issue relating to Ms. Reed was

— after the EPA had repeatedly told Dr. Walker to leave the Agency out of the matter — personal

business.

4.     *Preventing Dr. Walker from participating in functions or activities with the
Office (scientific workgroups, priority projects, etc.) that would allow him to
advance or be promoted to a GS 15 or above* [Compl. ¶ 16d].

Dr. Walker provides no details regarding this allegation, and the Court is unable to

discern the factual basis for it.  To the extent Dr. Walker alleges that the EPA took some action to

prevent him from being promoted (other than his non-selection for the position at OCHP), no such

allegation was presented in any of Dr. Walker's EEO charges and is therefore not properly before

the Court.  *See Morgan*, 536 U.S. at 113.  To the extent this claim is a reference to the non-selection,

the Court has already determined that the EPA's decision to offer the position to Ms. Goode instead

of Dr. Walker did not violate Title VII.

5.     *Preventing Dr. Walker from participating in functions with the Agency that
are commensurate with his skill, background and expertise (scientific
workgroups, priority projects, etc.)* [Compl. ¶ 16e].

Again, Dr. Walker does not provide any details regarding this claim and the Court

cannot decipher it.  It appears that this is essentially a duplicate of the preceding claim and therefore

fails for the same reasons.

> 6.   *Preventing Dr. Walker from using the Office email system to communicate with other line managers and scientists with NCEA/ORD on issues related to Office matters* [Compl. ¶ 16f].

As with Dr. Walker's claim that the EPA prevented him from using EPA letterhead to correspond outside the Agency, this claim exaggerates the facts.  Mr. Ris's email indicated only that Dr. Walker should not level serious allegations of misconduct against his coworkers in a global email without first giving the Agency the chance to investigate the matter confidentially.  This in no way prevented Dr. Walker from using the EPA's email system to communicate with his coworkers; it merely advised Dr. Walker to bring charges of misconduct more privately.

> 7.   *Preventing Dr. Walker from being selected to a high grade level position for which he was most qualified* [Compl. ¶ 16g].

This allegation clearly refers to the non-selection of Dr. Walker for the OCHP position.  The Court has addressed that claim at length and concluded that it was not discriminatory or retaliatory under Title VII.

> 8.   *Using the Letter of Reprimand to prevent Dr. Walker from being certified as a class agent* [Compl. ¶ 16h].

The Court has found no evidence that the EPA's conduct was unlawful in this regard. It therefore cannot form the basis for Dr. Walker's claim that there was a pattern of unlawful activity against him.

> 9.   *Preventing Dr. Walker from contacting EPA's Office of Inspector General on matters related to misuse of government funds and other related issues* [Compl. ¶ 16i].

This claim appears to be based on the email incident involving Mr. Ris.  Dr. Walker's allegations exaggerate the facts.  Mr. Ris's email did not prevent Dr. Walker from raising his concerns with the Inspector General.  In fact, the opposite is true:  Mr. Ris said that Dr. Walker

should have pursued the matter with management in a confidential manner before sending an open email to the entire department.

## IV.  CONCLUSION

The Court has combed Dr. Walker's complaint, his Opposition, Defendant's briefs, and all the exhibits presented in the record to analyze his allegations fairly and completely.  When each allegation properly before the Court is examined, the evidence fails to support the claims of illegal discrimination and retaliation.  Defendant's motion will be granted and judgment will be entered for Defendant.  A memorializing order accompanies this Memorandum Opinion.


DATE:  August 17, 2007                                    /s/
                                              ROSEMARY M. COLLYER
                                              United States District Judge