# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

Dr. James T. Walker,       )

         )

  **PLAINTIFF**       )

         )

  v.        )

        )   Civil Action

        )   No.05-2118 (RMC)

        )

  Stephen L. Johnson, Administrator  )

  US Environmental Protection Agency  )

        )

        )

        )

  **DEFENDANT**       )

## PLAINTIFF'S AMENDED MOTION TO DENY DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

On June 12, 2007, Plaintiff filed his response to the Defendant's February 2007

Motion to Dismiss or In the Alternative for Summary Judgment the above captioned case.

Plaintiff hereby files and amended Motion to the one he originally filed, because it had

many mistakes in it.  Plaintiff moves this Court for an order denying Defendant's

Motion.  In support of his Motion, Plaintiff submits the attached memorandum of points

and authorities with exhibits, a statement of material disputed and undisputed facts.

Respectfully Submitted,

*James T. Walker*

James T. Walker, *Pro Se*
136 West Quail Lane
La Plata, Maryland 20646
(301) 654-6376

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Dr. James T. Walker, | ) |
| | ) |
| | ) |
| **PLAINTIFF** | ) |
| | ) |
| | ) |
| v. | ) |
| | ) Civil Action |
| | ) No.05-2118 (RMC) |
| | ) |
| | ) |
| Stephen L. Johnson, Administrator | ) |
| US Environmental Protection Agency | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| **DEFENDANT** | ) |
| | ) |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS AMENDED MOTION TO DENY DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

Plaintiff, Dr. James T. Walker, ("Dr. Walker") is a Black African-American male, who is an employee at the USEPA ('the Agency"), files this action to address a continuous pattern discrimination on the accounts of race, sex and retaliation. He alleges that the Defendant discriminated against him by;1) issuing him a letter of reprimand "L of R" for sending a letter of inquiry to the University of Maryland; 2) not selecting him for a GS-14 Environmental Scientist position for which he applied and was qualified; 3) putting him on

forced administrative leave and creating violence in the workplace file on him because of a false allegation that was made by his summer intern; 4) sending the Agency lawyer a copy of the L of R that was supposed to be destroyed; 5) sending him a admonishment e-mail after he had sent a global email to staff and line manager inquiry about conflict of interest issues; and 6) refusing to remove the L of R from his files. As set forth below, Dr. Walker asserts that his complaint states claims for which relief can be granted and there remain genuine issues of material fact in dispute, which should go to trial.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

Dr. Walker hereby incorporates and relies on the record facts as provided in his statement of disputed and undisputed facts as to which there is a genuine dispute.

## II.     ARGUMENT

### A.      Legal Authority and Standards

Rule 8(a) (2) requires only that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief." In an employment discrimination case, the "plaintiff need not set forth the elements of a prima facie case at the initial pleading stage." Sparrow v. United Airlines, Inc, 216 F.3d 1111, 1111 (D.C. Cir. 2000). The Court will not grant a motion to dismiss for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Accordingly, at this stage of the proceedings, the Court accepts as true all of the complaint's factual allegations, and draws all reasonable inferences in favor of plaintiff. Hishonv. King & Spalding, 467 U.S. 69, 73 (1984). However, the movant is entitled to judgment if there are

no allegations in the complaint which, even if proven would provide a basis for recovery. Haynesworth v. Miller, 820 F.2d 1245, 1254 (D.C. Cir. 1987).

Title VII makes it an "unlawful employment practice" for an employer to discriminate against an individual "because of such individual's race, color, religion, sex, or national origin,"42 U.S.C. § 2000e-2(a) (1), or "because he has opposed any practice made an unlawful employment practice by this sub chapter," *id.* § 2000e-3(a). Absent direct evidence of intentional discrimination or retaliation, *see, e.g., Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002), an employee can establish a prima facie case of an unlawful employment practice under the "single motive" or "pretext" framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248(1981), if he proves by a preponderance of the evidence that he "applied for an available position for which [he] was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination [or retaliation]." *Burdine*, 450 U.S. at 253; *see McDonnell Douglas*, 411 U.S. at 802. The burden of production then shifts to the employer to rebut the presumption of discrimination or retaliation by presenting evidence of a legitimate reason for its employment decision. *See Burdine*, 450 U.S. at 254; *McDonnell Douglas*, 411 U.S. at802. The employee retains the ultimate burden of persuasion and may prove intentional discrimination or retaliation by demonstrating that the employer's proffered legitimate reason is pre-textual and not the "true reason" for the employment decision. *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411U.S. at 804.

For a retaliation claim, plaintiff must establish that (1) he engaged in a statutorily protected activity; (2) the Defendant took adverse personnel action; and (3) a causal

connection existed between the two. Rochon v. Ashcroft, 319 F.Supp. 2d 23, 30 (D.D.C. 2004) (Lamberth, J.). The anti-retaliation provision under Title VII seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. *Robinson,* 519 U. S., at 346. It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. The anti-retaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace. The provision covers those employer actions that would have been materially adverse to a reasonable employee that could well dissuade that employee from making or supporting a charge of discrimination. Burlington N. & S *F R. Co. v. White* 364 F. 3d 789 (2006).

A person who believes that she has been discriminated against on the basis of race, color, religion, sex or age must seek informal resolution of the matter by consulting an EEO Counselor within 45 days of the date of the matter alleged to be discriminatory. 29 C.F.R. § 1614.105(a) (1). This time period may be extended "when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them, that he or she did not know and reasonably should not have known that the discriminatory matter or personnel action occurred, [or] that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counselor within the time limits [.]" 29 C.F.R. § 1614.105(a) (2). The failure to exhaust administrative remedies is an affirmative defense and therefore the defendant bears the burden of proving the plaintiff's failure to exhaust administrative remedies. Aceto v. England, 328 F. Supp. 2d 1, 4 (D.D.C. 2004); Armstrong, 172 F. Supp. 2d at 20. Failure to exhaust administrative remedies by allowing the 45-day tolling period to elapse is not a jurisdictional defect but rather operates

4

like a statute of limitations that may be tolled for equitable reasons. Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982); Stewart v. Ashcroft, 352 F.3d 422, 425 (D.C. Cir. 2003). The plaintiff bears the burden of pleading and proving equitable reasons for noncompliance. Bayer, 956 F.3d at 332; McCants v. Glickman, 180 F. Supp. 2d 35, 39 (D.D.C. 2001). This Circuit has consistently held that equitable tolling should only be granted in "extraordinary and carefully circumscribed circumstances." Mondy v. Secretary of the Army, 845 F.2d 1051, 1057 (D.C. Cir. 1988); see also Washington v. Washington Metro. Area Transit Authority, 160 F.3d 750, 753 (D.C. Cir. 1998); Smith-Haynie v. Dist. of Columbia, 155 F.3d 575, 579-80 (D.C. Cir. 1998).

Generally, a federal employee must contact an agency equal employment opportunity ("EEO") counselor within forty-five days of an alleged act of employment discrimination in order for the claim to be timely. 29 C.F.R. § 1614.105(a) (1). However, in a pattern and practice suit where there is a continuing violation, a plaintiff may "litigate claims that fall outside of the time filing requirements if he proves either a 'series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during the statutory period." Pleasants v. Allbaugh, 185 F.Supp. 2d 69, 73 (D.D.C. 2002) (quoting Palmer v. Kelly, 17 F.3d 1490, 1495 (D.C. Cir. 1994)); see Anderson v. Zubieta, 180 F.3d 329, 337 (D.C. Cir. 1999) ("Where . . . discrimination is not limited to isolated incidents, but pervades a series or pattern of events which continue to within [45] days of the filing charge. . ., the filing is timely . . . regardless of when the first discriminatory incident occurred.") (quoting Laffey v. Northwest Airlines, 567 F.2d 429, 473 (D.C. Cir. 1976)). Claims dating back to the inception of the continuing violation may be pled. See EEOC v. Dial Corp., No. Civ. A. 99C3356, 2002

5

WL 1974072, at*4 (N.D. Ill. July 23, 2002) (allowing to proceed in the litigation any claims falling within the time period of the violation); see also Anderson, 180 F.3d at 337 n.10 (noting that plaintiffs may "recover for portions of the persistent process of illegal discrimination that antedated the limitations period.")(quoting McKenzie v. Sawyer, 684 F.2d 62, 72 (D.C. Cir. 1982)).

Summary judgment is proper only against "a party who fails to make a showing sufficient to establish the existence of any element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 321 (1986). Accordingly, to make the determination on a motion for summary judgment, the court must evaluate all of the evidence before it. *Celotex Corp.,* 477 U.S. at 323. In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986), the Supreme Court ruled that disputes over facts -- such as defendant's motive -- which might affect the outcome of the suit under the governing law will preclude the entry of summary judgment Id. at 248. In this regard, on considering a motion for summary judgment, the evidence presented must always be construed in favor of the party opposing the motion, and it is that party who is also to be accorded the benefit of all favorable inferences that can be drawn from the record evidence. *Beckett v. Air Line Pilots Association,* 59 F.3d 1276, 1279 (D.C. Cir. 1995), citing *Sherwood v. Washington Post,* 871 F.2d 1144, 1147-48 (D.C. Cir. 1989); see also *Adickes v. S.H. Kress & Co., supra; Liberty Lobby, Inc. v. Dow Jones & Co.,* 838 F.2d 1287, 1293 (D.C. Cir. 1988), *cert. denied,* 488 U.S. 825, and *Natural Resources Defense Council, Inc. v. Jamison,* 787 F. Supp. 231, 237 (D.D.C. 1990). Thus, the moving party must demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp., supra,* 477 U.S. at 323. If the moving party meets this burden, the

burden passes to the nonmoving party to establish the existence of a disputed factual element essential to his case with respect to which he bears the burden of proof. *Id.* Where the record taken as a whole could lead a rational trier of fact to find for the nonmoving party, the motion for summary judgment cannot be granted. *Russell v. Microdyne Corp.*, 65 F.3d 1229 (4th Cir. 1995); *Tuck v. Henkel Corporation,* 973 F.2d 371,374, 376-377 (4th Cir. 1992).Thus, summary judgment should be particularly disfavored where the intent and motivation of the defendant and its managers for their actions is the central issue because it is not generally amenable to resolution other than through a trial. E.g., *Schmidt v. Frosch,* 680 F.2d 248 (D.C. Cir. 1982). *See also, Goodrich v. International Brotherhood of Elec. Workers, AFL-CIO,* 712 F.2d 1488 (D.C. Cir. 1983), and *Samuels v. Raytheon Corp.,* 934 F.2d 388 (1st Cir. 1991). In an intentional discrimination case like the instant case, which necessarily involves issues of motive and intention, the issues cannot be resolved on summary judgment. As the Fifth Circuit long ago observed:

> When dealing with . . . discrimination cases which usually necessarily involve examining motive and intent, as in other cases which involve delving into the state of mind of a party, granting summary judgment is especially questionable.

*Hayden v. First National Bank of Mount Pleasant,* 595 F.2d 994, 997 (5th Cir. 1979). *See also Irwin v. United States,* 558 F.2d 248 (5th Cir. 1977) (Credibility issues cannot be resolved on summary judgment.) Indeed, Judges on this Court have warned that in employment discrimination cases, where direct proof of invidious motive is rare, summary judgment must be approached with special caution and the court "must be extra-careful to view all the evidence in the light most favorable" to plaintiff. Ross v. Runyon, 859 F.Supp. 15, 21-22 (D.D.C. 1994); see also, Batson v. Powell, 912 F.Supp. 565, 571 (D.D.C. 1996).

**B.    Dr. Walker's Complaint States Claims for Which Relief Can be Granted and There Remains Genuine Issues of Material Fact That are in Dispute.**

Because of Dr. Walker's EEO activities, he has been subjected to a hostile retaliatory work environment. In an effort to put him in his place and violate his civil rights, there has been a pervasive retaliatory policy against Dr. Walker when NCEA managers toke away his supervisory responsibilities; eliminated his summer interns program; toke away his ability to use EPA letterheads to communicate with individuals outside the Agency about EPA related matters; prevented him from participating in functions or activities within the Office (scientific workgroups, priority projects, etc.,) that would allow him to advance or be promoted; prevented him from participating in functions or activities within the Office/Agency that were commensurate with his skill, background and expertise (scientific workgroups, priority projects, etc,);prevented him from using the Office e-mail system to communicate with other line managers and scientists within NCEA/ORD on issues related to Office matters; prevented him from being selected to a higher grade level position that he was the most qualified for; used the Letter of Reprimand ("L of R") for preventing him from being certified as a class agent; and prevented him from contacting EPA's Office of Inspector General on matters related to the misuse of government funds and other related issues.  As shown below, Dr. Walker asserts that the complaint he filed does state claims for which relief can be granted and there remain genuine issues of material fact that are in dispute that should go to trial:

**1.    The Kathleen Reed Incident**

It is undisputed that Dr. Walker had filed a number of complaints against the Defendant and the NCEA managers were aware of those complaints.  On or about August 27, 1998, Ms. Kathleen ("Reed"), a summer intern from the University of Maryland ("U of M"), while working for Dr. Walker, who was Reed's supervisor and project leader, asked him to include her and her advisor's name, Dr. Whitehead, and their publications in a

research proposal that was submitted by Dr. Fatimah Jackson. Reed also asked Dr. Walker to include her name on the proposal as a principle investigator and a recipient of funds. Dr. Walker refused and told her that it was against federal law for her to make such a request to a government official and, because she had done nothing to finish her project, she had to leave the Agency . Reed responded loudly by saying that he had "raped" her and that she was not going to leave. Dr. Walker left her cubicle and returned to his office and called his supervisor Dr. Sonawane about the incident. He was later informed by her supervisor that Reed had told his managers that during the  discussion "....Dr. *Walker had turned towards her in a threatening manner.*" Dr. Walker was immediately questioned by a panel of White managers, put on "forced" administrative leave or suspension, and a "Violence in the Workplace" file was created on him, which still remains in his records at the Agency. (Exh. # 1 ) Dr. Walker was also relieved of his supervisory responsibilities and the entire minority internship program was eliminated. (Exh. # 1a,  ¶ 2, line 1) This was done despite the fact that Reed told these managers that he did not verbally threaten or physically touch her (Exh. # 2, pg 2, ¶ 3) and there was no evidence or facts to support Reed's allegation. Reed was not suspended and questioned like Dr. Walker and no "Violence in the Workface file was created on her. Furthermore,  his managers did not investigate his complaint and did not contact anyone at the University of Maryland about Reed's attempts to violate federal law (Exh. # 3). Because of the differences in how NCEA managers treated Dr. Walker, compared to Reed and similarly situated white scientists in NCEA, Dr. Walker contacted an EEO counselor and filed a discrimination complaint on August 27, 1998 . (Exh. # 4)

The Defendant asserts that, because Dr. Walker's supervisors attempted to diffuse

the tension between him and the intern by sending them home, the action taken by them did

not give rise to the level of adverse personnel actions or created an inference of

discrimination or retaliation.  Dr. Walker disagrees and asserts that there is sufficient

evidence to show that managers' motives were to retaliate against D̶r̶. Walker.  First,

because there was no evidence that there was any violence or tension between Dr. Walker

and the intern, the managers took beyond normal actions against Dr. Walker without an

investigation and proof.  There was only a disagreement between the two parties.  It is

undisputed that there have been many open disagreements and discussions in his office

between similarly situated white scientists.  However, unlike what happened when Reed

made her allegation, the managers did nothing with regards to other disputes between

similarly situated employees in Dr. Walker's office.  They did not force the individuals to

face a panel of managers and go home on administrative leave for a "cooling off" period.

They also did not call and involve a labor relations person or create a "Violence in the

Workplace" file on the individuals. Furthermore, the white scientists did not loose their

supervisory positions and their programs were not eliminated. As stated in the above,

despite the Defendant's assertions, the anti-retaliation provision does not confine the

actions and harms it forbids to those that are related to employment or occur at the

workplace. The provision covers those employer actions that would have been materially

adverse to a reasonable employee that could well dissuade that employee from making or

supporting a charge of discrimination.  The actions that were taken by the managers were

done  for the purpose of dissuading Dr. Walker  from making or supporting charges of

discrimination in NCEA.

10

## 2.   The December 3, 1998 Letter of Reprimand

Within days after contacting the EEO counselor regarding the issue addressed in the paragraph above, Dr. Walker, in his official capacity as an Agency employee, sent a letter of inquiry ("L of I") to the "U of M" under an EPA letterhead requesting information about Reed and her scientific and research credentials. (Exh. # 5). The purpose of the letter was to determine if there was sufficient evidence to cause him to contact EPA's Office of the Inspector General about fraud and other related issues. This letter was sent, pursuant to normal Agency procedures and rules and after Dr. Walker had obtained advice from Richard Drummond, an attorney from EPA's Office of General Counsel. (Exh. # 6, pgs. 13-14)  On December 3, 1998, Dr. Walker received a Letter of Reprimand (" L of R") from Michael Callahan, Director, National Center for Environmental Assessment-Washington Office ("NCEA-Wash") for sending the letter to the university. (Exh. # 7) Dr. Walker  had subsequently requested an EEO counselor and filed a discrimination complaint against the managers in NCEA. (Exh. # 8)

The Defendant asserts that Callahan reprimanded Dr. Walker for allegedly refusing to comply with instructions, for misrepresenting his status as an official representative of the Agency conducting official business, and for misuse of Agency letterhead for unauthorized business.  Dr. Walker disputes those assertions.  He argues that there is not a scintilla of evidence in the record to support any of Callahan's charges.  As shown below, the L of R was given to Dr. Walker and put in his OPF because of retaliation:

First, it is undisputed that there was a clear causal link between Dr. Walker's previous EEO activity and the L of R.  Callahan issued the L of R within weeks after Dr. Walker had filed his complaint against NCEA managers because of the Reed Incident.

Second, the Defendant did not produce any evidence that Dr. Walker refused to comply with his managers' instructions (Exh #9).  Third, there is no evidence that Dr. Walker misrepresented his status as an official representative of the Agency.  He clearly stated in the letter that the inquiry was on his behalf as an EPA employee.  Fourth, there is no evidence that Dr. Walker misused the Agency letterhead for unauthorized personal business.  The letter clearly addressed EPA business.  Fifth, the Defendant did not produce any evidence showing that Dr. Walker violated EPA policy by sending the letter.  In fact, Dr. Walker sent his managers an e-mail asking for guidance on the use of EPA letterheads and received no response. (Exh.# 10).  Sixth, Dr. Walker used EPA letterheads prior to the L or R to communicate with scientists in academia and was not reprimanded. (Exh.# 11)  Seventh, no other similarly situated scientists in Dr. Walker's office were reprimanded for using an EPA letterhead for official business (Exh. # 11a).  Eighth, no other similarly situated scientists in Dr. Walker's office were reprimanded for attempting to investigate fraud and the misuse of government funds (Id.).

### 2.    Non-Selection to the GS-14 Environmental Scientist Position

During July, 1994, Dr. Walker filed a discrimination complaint against his Office Director, Margo Oge based on reprisal, nepotism, national origin, race and retaliation. (Exh. #12a)  Margo Oge was the Director of the Office of Radiation and Indoor Air (ORIA).  On or about August 1994, Oge sent a memorandum to Dan Rondeau denying Dr. Walker's charges and mentioning the number of allegations he had raised against ORIA managers including her predecessor (Exh. #12b).  During late 1994, Oge was reassigned to

the Office of Global Sources and replaced by Ramona Trovato, who served in an acting or temporary capacity for about six months until she was permanently assigned to ORIA in February 1995. (Exh.# 12c.) In January 1995, about four- six months after Trovato became acting director of ORIA, Dr. Walker went a 120 day detail to the Office of Research and Development.(ORD). (Exh.#12d.) During April 1995, while he was on detail in ORD, he was offered an agreement to settle all prior EEO cases against the Agency and ORIA managers. Although Dr. Walker had originally requested a promotion to a GS-14 position, on April 30, 1995, he agreed to settle the EEO cases by accepting a within grade increase to a GS-13/10. (Exh. #20) The settlement agreement and promotion was authorized and signed by E. Ramona Trovato, the ORIA Office Director on April 30, 1995. (Exh. #20) Dr. Walker was officially reassigned to ORD in August 1995. (Exh. 12e.) Trovato was officially reassigned to ORIA in February 1995. (Exh. 12c).

On or about December 1997, Dr. Walker applied for a GS-14 Environmental Scientist position in the Office of Child Health Protection (OCHP) at the Agency.(Exh. #13 Ms. Kelly ("Kelly"), a white female, was the Subject Matter Expert (SME) responsible for rating and ranking the applicants and Ms. Romano Trovato ("Trovato"), a white female, who was the Director of OCHP, was the selecting official. Kelly, after having received and reviewed the applications for this position, under the direction of Trovato, changed the selection criteria by eliminating the "health physics" requirement.(Exh. # 14, pg 2, ¶ 2 ) After removing that criterion, and without sending out a new job announcement and receiving new applications, Kelley rated and ranked the applicants, and selected Ms. Paula Goode ("Goode"), a white female, for the position. (Exh. # 15)  Dr. Walker was rated sixth out of the ten applicants and was not rated "highly qualified" and not selected. (Exh. # 16)

He subsequently filed a complaint against the Defendant for discrimination based on race, sex and retaliation because of his previous EEO activities. (Exh. # 17)

Defendant asserts that this allegation fails to state a claim for which relief can be granted. Dr. Walker disputes this assertion for many reasons. First, he met his burden of showing prima facie discrimination. Evidence in the records show that he was qualified for the position. It is undisputed that, pursuant to the vacancy announcement and the summary rating and ranking sheet for the position, Dr. Walker met the minimum qualification requirements for the position. The vacancy announcement stated: Qualification Requirements: For the GS-14: Applicants must posses at least one year of directly related experiences equivalent to the GS-13 level." (Exh. #18) His application package showed that, prior to applying for the position, he had worked close to 13 years at the GS-13 level as an environmental scientist. (Exh#13) Furthermore, the SME gave Dr. Walker a rating score of "2.21," which fell in the "Q= Qualified" category (Exh.# 19).

Dr. Walker also met his burden of showing that he was rejected under circumstances which give rise to an inference of unlawful discrimination [retaliation]. First, he showed that there was a clear causal link between his previous EEO activity and the current action. It is undisputed that he had previously filed EEO complaints against ORIA managers. Second, he showed that there is undisputed evidence in the record confirming that both Kelly and Trovato were aware of Dr. Walker's EEO previous activity. Trovato, was involved in and authorized a settlement agreement resulting from two previous complaints that were filed against Trovato's managers, when she agreed to promote Dr. Walker to a GS-13/10. (Exh.#20) Third, there is evidence in the record which suggest that the selectee did not meet the minimum requirements for the GS-14 position for

which she was selected. Pursuant to OPM regulations and the vacancy announcement, for

the GS-14 position, all of the applicants should have possessed at least "one year of directly

related experiences equivalent to the GS-13 level." According to her resume, Paula Goode

did not meet that criterion. The undisputed facts show that she had only worked **six**

**months** at the GS-13 level. Her resume indicated that she was promoted from GS 12/8 to

GS-13/4 in 6/97 and worked at that level until she applied for the position in question  in

December 1997 (from "6/97 to present") (Exh. #21).    Fourth,  Dr. Walker's educational

qualifications and experiences were far superior to all of the candidates who made the GS-

13 and GS-14 Certificate ("cert").   He had a B.S. and M.S. in Physics and a Ph. D in

Radiation Biophysics.  He had worked as a senior environmental scientist with the EPA for

13 years. The selectee had no degree. She had only taken 30 credit hours in science

courses. Denny Cruz, the other applicant who made the GS-14 level cert had a B.S. degree

in chemical engineering with no experience in the health area. (Exh. # 22).  Robin

Anderson, who made the GS-13 cert, had a B.S. and M.S. in electrical engineering (Exh. #

23).  She also had no experience in the health area compared to Dr. Walker.  Dr. Walker is

the only applicant who had extensive experience in developing and applying scientific

models and concepts related to children's health. Regarding the Defendant's  and Kelly's

assertion that she had "no knowledge of the applicants' races at the time they were rated"

(Exh. # 24, ¶ 4  )) (Exh. # 25a, pg 3, ¶ 6)), this argument fails. Although the application

packages did not specifically ask for race, there was enough information in them for Kelly

to ascertain the race of each applicant. For example, in Dr. Walker's, application, he

indicated that he obtained B.S. and M.S in Physics from Howard University, which is well

known historical Black university. He also indicated that he was a member of the National

Society of Black Physicist and Blacks in Government. One can infer from reading his resume that he was Black. As another example, one could infer from Denny Cruz's name alone that he was Hispanic or Puerto Rican. But, when his application indicated that he obtained a B.S. in Chemical Engineering from the University of Puerto Rico, and that he was Physics Instructor at the University of Puerto Rico, and worked on Puerto Rico Environmental Quality Board (Exh. # 22), this is sufficient information for one to conclude that Cruz was Puerto Rican or Hispanic. Furthermore, with regards to Robin Anderson's race, when the application showed that she obtained a B.S. in Electrical Engineering from North Carolina A&T and M.S. in Electrical Engineering from Howard University, and included the statement **"I am an active member in the National Association for the Advancement of Colored People (NAACP),** (Exh.# 23 pg 2, ¶ 4 )" this should be sufficient information for one to infer that Anderson was a Black African-American female. This information attacks Kelly's creditability and provides further support that the real reason why Dr. Walker was ~~not~~ selected was because of discrimination. Furthermore, the Defendant's, Kelly's and Trovato's assertions that they "did not know who the applicants were at the time the rating criteria were changed" (Exh. # 16, pg 3, ¶ 4) also fails. The undisputed evidence shows that at the time the announcement was created and the decision made to excise that requirement, Kelly and Trovato knew at least one of the applicants, Paula Goode, the selectee. Goode's resume show that she was on detail from the ORIA in the OCHP working alongside both Kelly and Trovato as her assistant (Exh# 21). Furthermore five of the applicants, including Plaintiff, worked directly under Trovato when she was the ORIA Office Director (Goode, Walker, Anderson, Kuang Wei-Yei, and Barron). Dr. Walker asserts that Kelly and Trovato perverted the fairness of the selection

Goode,

process by "wiring" [preselection of an applicant] the position for an applicant who failed

to meet the minimum requirements and  by making changes to the announcement without

publicizing those changes in accordance with OPM regulations (Exh. #25c).  Furthermore,

Kelly rated the applicants with subjective rather than objective criteria in an attempt to

mask her intent to discriminate against those who were most qualified for the position.

According to the rating sheets, Kelly was required to identify and list the bases for each

individual's rating (Exh. #25b).  She failed to do that, and therefore, her ratings are

untrustworthy.   Furthermore, Kelly did not consider Dr. Walker's 5 points veteran's

preference for serving in the U.S. Air Force. (Exh. #13).

### 3.   Admonishment Notice from Management for Sending A Global E-mail

While the previously mentioned complaints in the above paragraphs were still being

considered by EEOC, on or about June, 2004 the office of Research and Development

published a list containing names of individuals who received cash awards, as a result of

the ORD's STAA competition. (Exh. #26).  Dr. Walker, who submitted a scientific paper

for the competition, was a bit suspicious because the list primarily contained names of

individuals who were either program directors/managers or persons who controlled the

research "purse strings" in NCEA/ORD, or personal friends of those individuals. On its

face, it appeared to Dr. Walker that this was a clear conflict of interest situation, in addition

to being discriminatory, because the awards were given to only white scientists and those

who were in position to control EPA funds and actually benefit from the distribution of

those funds.  During June, 2004, Dr. Walker sent a global email to top level managers and

scientists asking them to have the Inspector's Generals Office look into matter, because

the results appeared to be influence by discriminatory factors and there was an apparent

conflict of interest. (Exh. # 27) In response to the "global" e-mail, on June 25, 2004, under the direction of Drs. Preuss and Alapas, Mr. Charles Ris sent Dr. Walker an e-mail message admonishing, reprimanding, and threatening him for sending the global e-mail.(Exh. #28). This e-mail of admonishment has been and is still being maintained in Dr. Walker's file in NCEA, despite the fact that there was no EPA or NCEA policy in place which specifically addressed the proper use of e-mails. (Exh. #29). Dr. Walker alleges that Drs. Preuss and Alapas, and Mr. Ris issued the e-mail and have maintained it in his file because of retaliation for his participation in previous EEO activities.

It is the Defendants positions that with regards to this issue, Dr. Walker failed to exhaust his administrative remedies and, therefore, does not state a claim for which relief can be granted. Dr. Walker disagrees. It is an undisputed fact that he failed to contact an EEO counselor within 45 days of the admonishment email that he received in June, 2004 from NCEA managers. He did not attempt to initiate administrative proceedings until approximately a year later, a point significantly greater than 45 days after the email was sent to him. However, the 45-day time limit should have been extended by EPA's Office of Civil Rights ("OCR"), because just after the admonishment e-mail was sent to Dr. Walker, he immediately started to investigate the matter by contacting the Agency's Deputy Chief of Staff, Ray Spears, to determine if he violated any EPA policies by sending the "global" email (Exh. #30). Dr. Walker also sent an email to the Ms. Tinsely, Director of the Office of the Inspector's General, but to no avail (Exh. #30a). Spears referred Dr. Walker's email to EPA's Office of Resource Management who did not contact him with a final answer until about a year later. This was after Dr. Walker had sent many follow-up e-mails asking for the information  The official response from the Agency was that "there were no

policies in place with regards to e-mails" (Exh. #31). It was then when Dr. Walker determined that he was discriminated against by his managers and sent a message to request an EEO counselor or and subsequently filed a complaint with EPA's OCR. (Exh. #32). Because he had an equitable reason for his noncompliance with the 45-day rule, he did properly exhaust his administrative remedies before filing this complaint in this Court. His complaint should have been accepted and processed by EPA's OCR. The Defendant further asserts that this claim fails to rise to the level of actionable claims. Dr. Walker disagrees. As stated in the above, the anti-retaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace. The provision covers those employer actions that would have been materially adverse to a reasonable employee that could well dissuade that employee from making or supporting a charge of discrimination. The admonishment e-mail, in addition to the other actions taken against Dr. Walker, represents the continuous pattern of retaliation by the NCEA managers for the purpose of dissuading Dr. Walker from speaking up and addressing civil rights related issues. It is undisputed that , in contrast to Dr. Walker's e-mail which addressed official office business, other similarly situated employees within Dr. Walker's office have sent and are still sending out "global" e-mails of personal and non-business nature, but have not received admonishments, reprimands, or threats from NCEA managers (Exh. #33 , Exh.# 34, Exh. #35). Ris' admonishment e-mail has adversely impacted Dr. Walker's ability to directly communicate freely regarding office matters with other managers and scientists within and outside of his office.

**4.    Ris and Callahan Refusal to Remove the L of R from Dr. Walker's Official Personnel File (OPF)**

On or about June, 2000 Dr. Walker approached his then first line supervisor, Charles Ris, and asked him why the letter of reprimand was still in his files, since the issuing manager told Dr. Walker that it could be taken out before the recommended two year period had ended. Ris made the following statement: ***"I do not know. You are still filing all of those EEO complaints."*** He told the EEO counselor that he made that statement to Dr. Walker (Exh. # 36, pg 4, ¶ 3). The Defendant asserts that the "alleged failure to remove the letter from Plaintiff's personnel file (although it had never actually been placed there) prior to the originally stated two year period cannot form the basis for a Title VII discrimination claim." Dr. Walker disagrees. When Ris stated that he was keeping the letter in Dr. Walker's files because he had been "filing all of those EEO complaints" he expressed a retaliatory motive for not removing the L of R from Dr. Walker's OPF, which is direct evidence of discrimination. Furthermore, the Defendant's statement that the letter "had never actually been placed there" is untrue. In fact, there is evidence that the letter is still in Dr. Walker's OPF, close to eight years later. As a result of Dr. Walker's recent discovery request made in 2006, the Defendant sent him exhibit F7, Tab #1, pgs.# 0266-0272. Exhibit F7 is a copy of the L of R. (Exh.#7). Defendant's exhibit #21 is not an official copy of the reprimand, because it was not signed by Michael Callahan, the person who issued it. EPA's conduct and discipline policy states in relevant part that "unless withdrawn earlier, a written reprimand shall be removed from the official personnel folder no later than two years from the date of issuance." (Exh. # 37 pg 4) The Defendant has not removed the L of R from Dr. Walker's OPF and continues to violate that policy for the purpose of retaliating against him for his involvement in EEO activity.

Because there is direct evidence of retaliatory motive regarding Defendant's refusal to remove the L of R from Dr. Walker's OPF and the letter still remains there after close to eight years after it was supposed to be removed, his complaint does state a claim for which relief can be granted and there remains a genuine issue in dispute that should go to trial.

### 5. It is Undisputed that Ris and Starr Used the L of R to Retaliate Against Dr. Walker.

On or about December, 21, 2000, Dr. Walker filed a class complaint against the Defendant alleging discrimination based on race, sex, and retaliation. As the class complaint was being processed administratively through EEOC, on or about August 2001, Dr. Walker learned that his second line supervisor, Ris, sent Mr. Charles Starrs ("Starrs") a copy of the L of R. Starr represented the Agency in Dr. Walker's class action suit. Ris admitted to the EEO counselor that he sent a copy of the letter to Starrs. (Exh. # 38, pg 2, line 1-2). In doing so, however, he again violated EPA's conduct and discipline policy what states, in relevant part:

> "Once the reprimand is removed, it shall be destroyed and regarded as never having occurred. Reference may not be made to the withdrawn action as a previous official action, and the reprimand may not be used or relied upon to support a subsequent action." (Exh. # 37)

According to Agency rules, the "L of R" should have been removed from Dr. Walker's files close to 8 months earlier, by December 8, 2000, and not have been used or referred to by his managers, <u>unless</u> they were taking subsequent adverse personnel actions against him. Ris and Starrs violated that rule. Dr. Walker alleges that Ris sent Starrs a copy of the L of R to Starrs solely for the purpose of opposing Dr. Walker's class action suit and to retaliate against him for his involvement in that suit and other EEO activity. After receiving the letter form Ris, Starrs filed an "Agency Response to Produce Information and Opposition

to Class Certification with the EEOC which stated, in relevant part, that:

> "the December 3, 1998 reprimand ... ... .was issued because Complainant refused to comply with management instructions, misrepresented his status as an official representative of the Agency conducting official business and misused Agency letterhead for unauthorized business." (Exh. # 39, pg 19 )

Starrs knew that the above statement was not true and there was no evidence in the record to support it. Dr. Walker asserts that Starrs made the statement for retaliatory reasons. However, ~~his~~ *defendant's* motion to dismiss did not raise this issue. Dr. Walker takes this to mean that ~~he~~ *Defendant* concedes that this issue does state a claim for which relief can be granted which should go to trial.

## CONCLUSION

For all of the foregoing reasons, and in light of the comprehensive statement of genuine issues and the discussion therein, Dr. Walker respectfully submits that his complaint states claims for which relief can be granted and there are ample questions of material fact which must be resolved by a jury at trial on the issues that Defendant seeks summary judgment in this case. Therefore, the motion to dismiss or in the alternative for summary judgment is not available to Defendant, and his motion must be denied as a matter of law. The disputes on these claims can only be resolved by a jury after a full trial on the merits.

Respectfully Submitted,

James T. Walker, *Pro Se*
136 West Quail Lane
La Plata, Maryland 20646
(301) 654-6376

### CERTIFICATE OF SERVICE

I, James T.  Walker, hereby state that I have mailed a copy of this

## "PLAINTIFF'S AMENDED MOTION TO DENY DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT "

on this date June 19, 2007 to the following address:

Alexander D. Shoaibi
555 4th Street N.W.
Washington, DC. 2001

James T. Walker

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Dr. James T. Walker,<br><br>**PLAINTIFF**<br><br>v.<br><br>Stephen L. Johnson, Administrator<br>US Environmental Protection Agency<br><br>**DEFENDANT** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action
No.05-2118 (RMC)

### PLAINTIFF'S STATEMENT OF MATERIAL FACT
### AS TO WHICH THERE IS A GENUINE DISPUTE

In support of the Plaintiff's Motion to Oppose Defendant's Motion to Dismiss

and in the Alternative for Summary Judgment, and pursuant to LCVR 7/1(h), Plaintiff

hereby submits the following statement of material fact to which there is a dispute:

1.      During July, 1994 Plaintiff filed a discrimination complaint against his Office

Director, Margo Oge based on reprisal, nepotism, national origin, race and retaliation.

(Exh. #12a)

2.      Margo Oge was the Director of the Office of Radiation and Indoor Air

(ORIA).

2.      On or about August 1994, Oge sent a memorandum to Dan Rondeau denying Plaintiff's charges and mentioning the number of allegations he had raised against ORIA managers including her predecessor (Exh. #12b).

3.      During late 1994, Oge was reassigned to the Office of Global Sources and replaced by Ramona Tomato, who served in an acting or temporary capacity for about six months until she was permanently assigned to ORIA in February 1995. (Exh. #12c.)

4.      In January 1995, about four- six months after Trovato became acting director of ORIA, Plaintiff went a 120 day detail to the Office of Research and Development. (ORD) (Exh. #12d)

5.      During April 1995, while Plaintiff was on detail in ORD, he was offered an agreement to settle all prior EEO cases against the Agency and ORIA managers.

6.      Although Plaintiff had originally requested a promotion to a GS-14 position, on April 30, 1995, he agreed to settle the EEO cases by accepting a within grade increase to a GS-13/10.  (Exh. #20)

7.      The settlement agreement and promotion was authorized and signed by E. Ramona Trovato, the ORIA Office Director on April 30, 1995 (Exh. #20)

8.      Plaintiff was officially reassigned to ORD in August 1995. (Exh.12e.)

9.      In the interim between 1995 and 1997, Ramona Trovato was reassigned to be the Director of the Office of Children's Health Protection. (OCHP).

10.      On December 2, 1997, Trovato signed a classification action to create the GS-13 and GS-14 positions in her office.  The action included a statement of the major duties and responsibilities for the position. (Exh. #12 f)

2

11.     Immediately following this action the Agency published a vacancy announcement for the GS-13 and GS-14 Environmental Scientist position, pursuant to vacancy announcement number 8-OA-9014.  (Exh #12g)

12.     At the time the announcement was created and this decision made, Goode was on detail in the OCHP working alongside of Kelly and Trovato's as her assistant (Exh. # 21).

13.     In December 1997, Plaintiff and the other applicants applied for the GS-14 Environmental Scientist position. (Exh. #13)

15.     Margret Kelly was the Subject Matter Expert (SME) and had the responsibility for ranking the applicants for submission to Trovato, who was the selecting official for the position.  Francine Butler was the Personnel Management Specialist who issued the vacancy announcement and received the applicants' packages.

16.     Sometime after the vacancy announcement was published and the applicants had submitted their applications, Kelly and Trovato decided to excise the "health physics" requirement under KSA #1(Exh. 14, pg 2,¶2) .

17.     When the decision to excise the "health physics" factor in KSA#1, Kelly and Trovato knew at least five of the applicants (Goode, Walker, Roberson, Barron and Kuang-Wei ), because they all worked for Trovato in her previous role as ORIA Director.

18.     OPM regulations stipulates that the removal of the health physics factor from the announcement  requires the modified announcement to be publicized again before the position is filled.  Kelly and Trovato violated that rule. (Exh. # 25c)

19.     The applicants for the position were not evaluated based on the same criteria. Pursuant to the instructions found on the applicant's rating sheets, Kelly did not itemize information on applicant's evidence of the rating factors and therefore used subjective

3

rather than objective factors in rating the applicants. (Exh. #25)

20.    The vacancy announcement specified that all applicants had to meet the minimum time-in-grade qualification requirements within 30 calendar days of the closing date of the announcement and that applicants for the GS-14 position can qualify for that position if they had  at least one year of directly related experience equivalent to the GS-13 level. It further stated that applicants who do not meet the above qualification requirements will not be evaluated to determine the extent of their knowledge, skills and abilities for the position. (Exh. #12g)

21.    Kelly deemed Paula Goode, a white female, and Denny Cruz, a Hispanic male as "highly qualified" for the GS-14 position and deemed Robin Anderson, a black female, as "highly qualified" for the GS-13 position. (Exh. #7)

22.    In is undisputed that Paula Goode's and Denny Cruz's names appeared on the GS-14 cert (Exh. # 15) .

23.    Goode was selected from that cert. (Exh. #15)

24.    Goode's resume show that she did not meet the minimum requirements for the GS-14 position for which she was selected, because she had worked only 6 months at the GS-13 level (from 6/97- 12/97). (Exh. #21)

25.    In is undisputed that, although Goode was deemed "highly qualified" by Kelly and selected by Tomato, she was the **only** applicant who failed to meet the minimum requirements for the GS-14 positions.

26.    In is undisputed that Kelly had knowledge of the applicants' races at the time she ranked them.

4

27.     In is undisputed that Plaintiff had a superior academic and work experience background compared to all of the applicants who made the GS-13 and GS-14 Cert. He had a B.S. and M.S. in Physics and a Ph.D in Radiation Biophysics. He had worked as a senior environmental scientist with the EPA for 13 years. The selectee had no degree. She had only taken 30 credit hours in science courses. Denny Cruz, the other applicant who also made the GS-14 level cert had a B.S. degree in chemical engineering. Robin Anderson, who made the GS-13 cert had a B.S. and M.S. in electrical engineering. Dr. Walker is the only applicant who had extensive experience in developing and applying scientific models and concepts related to children's health. (Exh. #13)

28.     In is undisputed that Kelly told the EEO counselor that "ranking factor number one was an irrelevant point for the job. The factor was removed before receiving the package of applications." (Exh. #25a, pg 3, ¶ 5)

29.     On or about June, 2004 the Office of Research and Development published a list containing names of individuals who received cash awards, as a result of the ORD's STAA competition. (Exh.#26)

30.     In is undisputed that Plaintiff, who submitted a scientific paper for the competition, was a bit suspicious, because the list primarily contained names of individuals who were either program directors/managers or persons who controlled the research "purse strings" in NCEA/ORD, or their personal friends.

31.     In is undisputed that the publication appeared to Plaintiff that this was a clear conflict of interest situation and the awards were given to only white scientists and those who were in position to control EPA funds and actually benefit from the distribution of those funds or those individuals who were personal friends of the decision makers in

5

NCEA.

32.    On or about June, 2004, Plaintiff sent a "global" email to NCEA, ORD managers, and scientists, expressing his concerns and asking management to look into this matter by asking the Office of the Inspector General to provide a reading on whether his concerns were justified.(Exh.#27)

33.    On June 25, 2004, Ris sent Plaintiff an e-mail message admonishing, reprimanding, and threatening him for sending the global email. (Exh. #28)

34.    In is undisputed that the e-mail of admonishment and reprimand from Ris is still being maintained in Plaintiffs file in NCEA.

35.    Plaintiff started investigating the matter by sending an e-mail to Ray Spears, the Agency's Deputy Chief of Staff, asking him to review the email that he sent to determine if he had violated any EPA policies. (Exh. #30)

36.    Plaintiff received a response from Spears indicating that he would forward Plaintiff's request to the OARM. (Exh. #30)

37.    Almost one year later, Plaintiff received an e-mail the OARM (Brenda Despanza) indicating that there was no EPA policy regarding the sending of global e-mails. (Exh. #31)

38    After receiving that e-mail, Plaintiff sought EEO counseling and then filed an official complaint alleging that Drs. Preuss and Alapas, and Mr. Ris issued the admonishment e-mail and have maintained it in his file because of retaliation for his participation in previous EEO activity and discrimination because of his race. (Exh. #32)

39.    Plaintiff sent an e-mail asking for clarification of the type of global e-mails that were permissible in  his Office. (Exh. #33)

40.    David Bussard, Plaintiff's second line supervisor, advised  Ris to "decline to

address" Plaintiffs "specific case." (Exh. #2b)

41.     Ris sent an email which did not address the specific questions that
Plaintiff raised in his original email. (Exh. #2c)

42.     In contrast to Plaintiff's e-mail, which addressed official office business, other
similarly situated scientists in Plaintiff's office sent global emails that did not address office
business  (Exh. #33,Exh. #34, (Exh. #35) and were not sent e-mails of admonishment and
reprimands and kept in NCEA files.


43.     Plaintiff sent a letter of inquiry ("L of I") to the "U of M", under an EPA letterhead,
requesting information about Reed and her scientific and research credentials (Exh. #5) The
purpose of the letter was to determine if there was sufficient evidence to cause him to
contact EPA's Office of the Inspector General about the violations of government grants
and contract laws.

44.     This L of I was sent, pursuant to normal Agency procedures and rules and after
Plaintiff had obtained advice from Richard Drummond, an attorney from EPA's Office of
General Counsel. (Exh. #6, pgs. 13-14)

45.     On December 3, 1998, although it was known that Plaintiff contacted and received
advice from Drummond, he was issued a Letter of Reprimand (" L of R") from Michael
Callahan, Director, National Center for Environmental Assessment-Washington Office
("NCEA-Wash") for sending the L of  I. (Exh. #7)

46.     Callahan issued the L of R within weeks after Plaintiff had filed an EEO complaint
against NCEA managers because of the Reed Incident.

47.     The L of R indicated that Plaintiff had allegedly refused to comply with his
managers instructions, misrepresented his status as an official representative of

7

the Agency, misused the Agency letterhead for unauthorized personal business and violated EPA policy by sending the letter. The L of R did produce any evidence to support the above charges, however (Exh. #9).

48. Plaintiff sent his managers an e-mail asking for guidance on the use of EPA letterheads and received no response.(Exh.#10).

49. Plaintiff used EPA letterheads, prior to the L or R, to communicate with scientists in academia. (Exh. #11)

50. No other similarly situated scientists in Plaintiff's office were reprimanded for using an EPA letterhead for official business. (Exh. #11a)

51. The letter and action taken by Callahan and an NCEA manager violated the Whistle Blower's Act and Title VII.

52. The L of R was supposed to stay in the file for only 2 years. (Exh. #37, pg. 4)

53. Plaintiff filed a discrimination complaint against NCEA managers for issuing the L of R. (Exh. #8)

54. On or about June, 2000, Plaintiff approached his then first line supervisor, Charles Ris, and asked him why the letter of reprimand was still in his files since the issuing managers told him that it would be taken out before the recommended two year period had ended.

55. Ris made the following statement: *"I do not know. You are still filing all of those EEO complaints."*

56. He told the EEO counselor that he had made that statement to Plaintiff (Exh.#36, pg. 4,¶ 3).

57.     As a follow-up to the conversation with Ris, on September 15, 2000, Plaintiff sent an email to Callahan, his ex-supervisor, asking him to remove the letter of reprimand from his files.

58.     Callahan refused to remove the L of R.

59.     On or about December, 21, 2000, Dr. Walker filed a class complaint against the Defendant alleging discrimination based on race, sex, and retaliation.

60.     On or about August 2001, Plaintiff had learned that his second line supervisor, Ris, sent  Mr. Charles Starrs ("Starrs") a copy of the L of R.  Starr represented the Agency in Plaintiff's class action suit.

61.     Ris admitted to the EEO counselor that he sent a copy of the L of R to Starrs. (Exh. #38).

62.     According to Agency rules, the "L of R" should have been removed from Plaintiff's OPF close to 8 months earlier, by December 8, 2000, and not have been used or referred to by his managers, <u>unless </u>they were taking subsequent adverse personnel actions against him. (Exh #39, pg. 2, line 1-2).

63.     In is undisputed that  Ris violated that rule by sending a copy to Starrs.

64.     In is undisputed that Plaintiff filed a complaint  alleging that Ris had sent a copy of the L of R to Starrs solely for the purpose of letting Starrs use it to oppose Plaintiff's class action suit and to retaliate against him for his involvement in that and other EEO activity.

65.     In is undisputed that on or about August 27, 1998, Ms. Kathleen ("Reed"), a summer intern from the University of Maryland ("U of M"), while working for Plaintiff, who was Reed's supervisor and project leader, asked him to include her and her advisor's name, Dr. Whitehead, and their publications in a research proposal that was submitted by

Dr. Fatimah Jackson.

66.    In is undisputed that Reed also asked Dr. Walker to include her name on the proposal as a principle investigator and a recipient of funds.

67.    In is undisputed that Dr. Walker refused and told her that it was against federal law for her to make such a request to a government official and, because she had done nothing to finish her project, she had to leave the Agency.

68.    In is undisputed that Reed responded loudly by saying that he had "raped" her and that she was not going to leave.

69.    In is undisputed that Soon afterwards, Plaintiff left her cubicle and returned to his office and called his supervisor Dr. Sonawane about the discussion. He was later informed that Reed had told his managers that during the discussion "....Dr. Walker had turned towards her in a threatening manner."

70.    Dr. Walker was immediately questioned by a panel of White managers, put on "forced" administrative leave or suspension, and a "Violence in the Workplace" file was created on him, which still remains in his records at the Agency. (Exh.#1)

71.    Dr. Walker was zeroed in on and relieved of his supervisory responsibilities and the entire minority internship program was eliminated. This was done despite the fact that Reed told these managers that he did not verbally threaten or physically touch her, there was no evidence or facts to support Reed's allegation and NCEA managers were aware of Reed's history at the university. (Exh.#2, line 1, Exh. #1a,  Exh. #1b)

72.    Reed was not suspended and questioned like Dr. Walker and no "Violence in the Workface file was created on her. Furthermore, NCEA managers did not contact anyone at the University of Maryland about Reed's attempts to violate federal law. (Exh. #3)

10

73.     Because of the differences in how NCEA managers treated Dr. Walker compared to

Reed and similarly situated white scientists in NCEA, Dr. Walker contacted an EEO

counselor and filed a discrimination complaint on the basis of race and sex. (Exh. #4)


                                        Respectfully Submitted,

                                        _James T. Walker_

                                        James T. Walker, *Pro Se*
                                        136 West Quail Lane
                                        La Plata, Maryland 20646
                                        (301) 654-6376

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Dr. James T. Walker, | ) |
| | ) |
| | ) |
| **PLAINTIFF** | ) |
| | ) |
| | ) |
| v. | ) |
| | ) Civil Action |
| | ) No.05-2118 (RMC) |
| | ) |
| Stephen L. Johnson, Administrator | ) |
| US Environmental Protection Agency | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| **DEFENDANT** | ) |
| | ) |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## STATEMENT OF MATERIAL FACT

In support of the Defendant's Motion to Dismiss, or in the Alternative for

Summary Judgment, Defendant submitted a statement of material fact.   Below is

Plaintiff's response to that statement.  He states that for:


Defendant's Statement #1.   He Does Not Dispute.

Defendant's Statement #2.   He Does Disputes

Defendant's Statement #3.   He Does Disputes.  This statement can not be verified and lacks creditability.

Defendant's Statement #4.   He Does Disputes.  Since there is strong evidence in the records to indicate that the position was "wired" [created specifically for Paula Goode], any statement made by Kelly and Tomato that they did not know the applicants lacks creditability.  Goode was in their office working alongside of these individuals when the job announcement was created and published (Ex. #21).  Furthermore the duties and responsibilities and the language and wording found in the announcement and the final position description (Ex. #12f) almost exactly matches that  in Goode's resume. (Ex. #21)

Defendant's Statement #5.   He Does Disputes:  Defendant has no way of confirming this statement.  However, according to OPM regulations, to increase the pool of qualified candidates, any changes or amendments in the vacancy announcement should have been announced and publicized before the position was filled (Exh.#25c).  It is most likely that this was not done because the position was already "wired" for Goode.

Defendant's Statement #6.   He Does Disputes.  There is no evidence to prove or support this statement.  Plaintiff asserts that all of the applicants were not evaluated based on the same criteria.  Despite there were clear instructions in the ranking package for Kelly to provide information showing the bases for her individual ratings of the different ranking factors (Exh. #25), she failed to provide that information.

Defendant's Statement #7.   He Does Disputes.  The two individuals who were deemed "highly qualified" for the GS-14 position were Paula Goode, a white female, and Denny

Cruz, a Puerto Rican male. Robin Anderson, a black female, was ranked 'highly qualified" for the GS-13 position. (Exh. #16)

Defendant's Statement #8.   He Does Disputes.   Plaintiff was ranked sixth of the nine candidates and was not placed on the merit promotion certificate or "best" qualified list for this vacancy announcement because of discrimination. (Id.)

Defendant's Statement #9.   He Does Disputes. Goode did receive the higher scores because Kelly and Trovato discriminated against Plaintiff.

Defendant's Statement #10. He Does Disputes.  Plaintiff sent an attached note along with the original complaint indicating that he alleged that the non-selection represented a continuous pattern of discrimination.

Defendant's Statement #11. He Does Disputes.  The EEOC erred in granting the Agency's motion for summary judgment against the Plaintiff, which explains why the case is before this Court.

Defendant's Statement #12. He Does Objects and Disputes.  This statement is not factual.  There was no evidence introduced into the record to show that there was violence or an altercation between Plaintiff and the summer intern and that he had approached her in a threatening manner.

Defendant's Statement #13. He Does Objects and Disputes.  There was no need for a "cooling off period," because there was no altercation.  There was also no evidence of "residual anger" between the two parties.

Defendant's Statement #14. He Does Objects and Disputes. There was no evidence introduced into the record to show that there was an altercation or violence between Plaintiff and the summer intern.  Despite this and the fact that "no blame was found"

3

between Plaintiff and the summer intern and "the investigation was closed," the matter

was recorded in EPA's Violence in the Workplace file under Plaintiff's name. (Exh #1a)

Defendant's Statement #15. He Does Disputes. The Agency ignored the other

allegations that Plaintiff brought forth in his complaint.

Defendant's Statement #16. He Does Disputes. The EEOC erred in dismissing

Plaintiff's complaint, which explains why the case is before this Court.

Defendant's Statement #17. He Does Objects and Disputes. There was no evidence

introduced into the record to show that there was an altercation between Plaintiff and

the summer intern.

Defendant's Statement #18. Objects and Disputes. There is no evidence introduced in

the record to show that Plaintiff violated management instructions. He does not dispute

that the fact that he sent the letter to the President of the intern's university. However,

he was not given instruction on communicating with university officials. Plaintiff does

dispute the suggestion that he needed clearance from EPA management to send such a

letter. Plaintiff is a senior scientist at the Agency and there is/was no policy in place

requiring management's clearance of such letters. Plaintiff was advised by a lawyer in

the Agency's Office of General Counsel to send the letter, because the summer intern

violated federal law by attempting to influence a government official to commit illegal

acts. There is no evidence to show that Plaintiff harassed the summer intern as she

alleged.

Defendant's Statement #19. He Objects and Disputes. Plaintiff did not threaten the

university in any way, when he indicated that "if he did not receive this information

"within thirty working days" he would forward the matter to EPA's Inspector General's

Office." Plaintiff merely wrote the statement to establish a time limit for a response from the university before determining if it was necessary to contact the IG Office. (Exh. #5). Furthermore, there was evidence presented to management that supported Plaintiff's claim that the intern did basically the same thing at the U of M. (Exh. #41b) Management refused to accept that information and focused primarily on attacking Plaintiff.

Defendant's Statement #20. He Objects and Disputes. Plaintiff's does not dispute that Callahan's L of R was to be placed in his personnel files for a period not to exceed two years. He, however, disputes Defendant's claims that the file did not contain the letter or it was never placed there. The L of R with Callahan's signature showed up in the documents that Plaintiff's received from his recent discovery request, as indicated by the EPA designated case number and page numbers which appears on the documents.(Exh. #7) This finding has increased significance for two primary reasons. First, the Agency was required to take the letter out of his files in December 2000. The letter remains there some seven years later. Second, the statements that Ris and Hamlet made, indicating that they attempted to remove the letter, are untrue. The letter remains in Plaintiff's files.

Defendant's Statement #21. He Does Not Dispute

Defendant's Statement #22. He Does Disputes. EEOC erred in granting summary judgment on this issue, which explains why the case is currently before this Court.

Defendant's Statement #23. He Does Objects and Disputes. EPA's Office of Civil Rights erred in rejecting Plaintiff complaint regarding the email because the amount of time to contact an EEO counselor should have been extended, Plaintiff in his original complaint

stated that he was not aware of being discriminated against until May 3, 2005, when he was informed that there was no EPA policy on global e-mails.

Respectfully Submitted,

James T. Walker, *Pro Se*
136 West Quail Lane
La Plata, Maryland 20646
(301) 654-6376

6